In the United States District Court
For the District of New Mexico

FILED
U.S. DISTRICT COURT
DISTRICT OF NEW MEXICO

2017 AUG -7 PM 4: 58

CLERK-LAS CRUCES

United States of America,
       Plaintiff/Respondent;

vs.

Erik Bilal Khan
       Defendant/Petitioner.

)
)
)
)
)
)
)
)
)

CR No: 2:12-cr-02901-RB-1

CV No: 17-cv-00744-RB-CG

---

**Memorandum of Law**
**In Support of Motion to Vacate, Set Aside or Correct Sentence**
**Pursuant to 28 USC 2255**

---

Erik Khan, Pro Se, brings a motion to vacate, set aside or correct his sentence for violations of the United States Constitution. In support, Mr. Khan submits:

I.      **Introduction**

Between 2011 and 2012, the United States Department of Homeland Security opened an investigation in the Las Cruces area regarding trafficking in child pornography. Utilizing a privately owned system, agents located an IP address that appeared to be trafficking in child pornography. The United States Department of Homeland Security then proceeded to make an arrest and perfect a prosecution against Erik Khan.

The United States' case opened on or about May 18, 2012 and continued for over four (4) years. Throughout the case, Mr. Khan suffered numerous errors from both sides of the table.

This memorandum will explore the violations of the Fifth and Sixth Amendments and challenge the statutes of conviction for vagueness and overbreadth. The Court will be appalled at the level of incompetence demonstrated throughout this case.

II.      **Procedural History**

On or about May 9, 2012 agents from the Department of Homeland Security and Las Cruces Police Department executed a state issued search warrant and arrested Erik Khan on site. Subsequently, the State of New Mexico charged Mr. Khan with various violations of sexual exploitation laws (State of NM v. Eric Khan, M-14-FR-201200382 (Las Cruces)(Exhibit A)). On or about May 17, 2012, a state grand jury returned an indictment alleging fifteen counts of sexual exploitation of a child in violation of NMSA 30-6A-3(D) (State of NM v. Eric Khan, D-307-CR-201200560 (Las Cruces District)(Exhibit B)). On or about May 21, 2012, the District Attorney dismissed that case, and the case was opened federally on or about May 18, 2012 by the filing of a criminal complaint (United States v. Erik Bilal Khan, 2:12-mj-01191-SMV-1 (D.N.M.)(Exhibit C)). The Court held a detention hearing on or about May 30, 2012 where Erik Khan was denied bail and detained, (Exhibit C at 4). On or about November 9, 2012, the United States Attorney's Office dismissed the case without prejudice (Id. at 3).

On or about November 9, 2012, the United States refiled its criminal complaint and opened a new case number with identical language as the first [Doc. 1] ("Doc." citations refer to United States v. Erik Bilal Khan, 12-cr-02901-RB-1). On or about November 13, 2012, the Court held an initial appearance hearing and set the case for a preliminary/detention hearing [Doc. 4]. On or about November 14, 2012, a federal grand jury returned an indictment alleging three (3) counts of violating child pornography trafficking/possession laws [Doc. 7]. On or about November 20, 2012 an arraignment was held where defense counsel entered a plea of not guilty [Doc. 10].

On or about December 14, 2012, the Court issued an order declaring the case complex and excluded time under the Speedy Trial Act [Doc. 15]. Between December 14, 2012 and June 4, 2013 there was no activity for this case on the Court's docket.

On or about June 3, 2013, defense counsel filed a Motion to compel the production of discovery [Doc. 21], to which the government responded [Doc. 23]. Defense counsel also filed a Motion to Suppress for violations of the Sixth Amendment right to

counsel [Doc. 22]. On or about July 17, 2013, a federal grand jury returned a superseding indictment adding an allegation of attempted production of child pornography [Doc. 26].

On or about August 1, 2013, the defense moved to suppress the fruits obtained from a search alleging violations of the Fourth Amendment [Doc. 31]. Following a hearing on both motions to suppress held on or about October 1, 2013 [Doc. 50], the Court entered an Order denying the motions [Doc. 55]. On or about November 25, 2013, Mr. Khan entered a plea of guilty to all four counts of the indictment [Doc. 66] pursuant to an agreement reached between Mr. Khan and the United States [Doc. 65].

After Mr. Khan discovered numerous errors made by Mr. Gorence and Mr. Bowles throughout their representation, new counsel was retained and entered their appearance on or about March 20, 2014 [Doc. 73-74]. New counsel moved to vacate Mr. Khan's plea under Rule 11(d)(1) as the District Court had not yet formally accepted the plea at that time [Doc. 84]. In a subsequent motion, the defense also presented that Mr. Khan's plea was unknowing and involuntary under Rule 11(d)(2)(B) [Doc. 91]. Following a hearing on the matter [Doc. 109], the Court denied Mr. Khan's motions to vacate his plea on or about July 6, 2015 [Doc. 110].

Following a flurry of litigation by defense counsel [Doc. 116-159], the United States negotiated an amended plea agreement stipulating to 240 months imprisonment with Lifetime Supervised Release [Doc. 170]. The Court and Mr. Khan accepted the terms of the Rule 11(c)(1)(C) agreement and the Court imposed the agreed upon sentence on or about June 27, 2016 [Doc. 171]. The Court entered judgement on or about July 1, 2016 [Doc. 173] and amended that judgement to reflect a prison placement recommendation on or about July 7, 2016 [Doc. 174].

Inasmuch as there will be reference throughout this Memorandum to State proceedings, Mr. Khan points the Court's attention to the procedural facts of those cases. In State of New Mexico v. Erik Khan (D-307-CR-2013-_____ (Las Cruces District)), the State alleged that Mr. Khan had inappropriate contact with a 13 year old

boy, while allegedly posing as a physician. After the release of Mr. Gorence and Mr. Bowles, new defense counsel conducted a comprehensive investigation into the State's allegations. That investigation unveiled that it was highly unlikely that the allegation was valid. Indeed, the State of New Mexico dismissed that case immediately after the defense began witness interviews.

In State of Arizona v. Erik Khan (CR2015-000944-001 (Maricopa Superior Court)), the State of Arizona alleged that Mr. Khan had inappropriate contact with a 12 year old boy while working at a residential treatment center for juvenile sex offenders between February 2001 and February 2002. Federal defense counsel, and subsequent state defense counsel, conducted a comprehensive investigation into the allegations. This investigation uncovered clear and convincing evidence that Mr. Khan did not commit any crime against the "victim" and if the "victim" was actually victimized that Mr. Khan was misidentified by police. It became evident that Mr. Khan: was not present during the dates alleged, the victim never identified Mr. Khan by name or other police identification method, the victim had motive to lie, the victim had a history of lying to his own benefit, and witness interviews showed that it was highly unlikely that any sexual assault was ever committed against any child at the residential treatment facility in question.

Be that as it may, the State of Arizona insisted on prosecuting the case and transported Mr. Khan to the State of Arizona on or about December 15, 2016. After the defense filed a motion to remand for, inter alia, failing to present exculpatory evidence to the grand jury, the State negotiated a plea of NO CONTEST to a single count of attempted molestation and the Court sentenced Mr. Khan to a term of life probation to begin after his "BOP sentence" is complete. Mr. Khan is presently engaged in post conviction litigation pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.

III.    **Timeliness**

28 USC 2255(f) imposes a "one-year period of limitation that, absent new

factual or legal developments, runs from the date which the judgement of conviction becomes final" (United States v. McGaughy, 670 F.3d 1149, 1160 n. 2 (10th Cir. 2012)). For the purposes of this case, the judgement became final when the expiration for a notice of appeal had lapsed under Rule 4 of the Federal Rules of Appellate Procedure.

The judgement in this case was filed on or about July 1, 2016 [Doc. 173]. However, the Court entered an amended judgement on or about July 7, 2016 [Doc. 174]. A review of the case law does not discuss whether the time limitations for filing a notice of appeal begins to run at the filing of the original judgement or the amended judgement. For protection sake, Mr. Khan will proceed stipulating that the original judgement controls and the expiration date to file a notice of appeal was on or about July 15, 2016 (see: United States v. Lonjose 663 F.3d 1292, 1298-99 (10th Cir. 2011)("...the time limit on a defendant's right to appeal his sentence begins to run at the moment the district court enters its judgement of conviction containing the sentence.")). The amendment did not change the judgement of conviction or the sentence - it only adjusted a recommendation to the Bureau of Prisons. Therefore, the deadline for filing a Motion to Vacate, Set Aside, or Correct a Sentence in Mr. Khan's case is on or about July 15, 2017 (1 year and 14 days following the entry of judgement).

The motion itself was placed in the institutional mailing system on or about July 10, 2017 [Doc. 194 at 13 and 68]. The Clerk received and filed the motion on or about July 14, 2017 (Id.). Pursuant to Houston v. Lack, 487 US 266, 270 (1988) and United States v. Spence, 625 Fed. App'x. 871, 874 (10th Cir. 2015)(unpublished), the motion is deemed filed when it is properly placed in the prison legal mail mailing system ("the Prison Mailbox Rule"). Thus, the motion is deemed filed on or about July 10, 2017; prior to the expiration of the limitations period.

IV.     Grounds for Relief

        A.      Introduction

        In his motion to vacate, Mr. Khan presses three (3) grounds for relief.

First, Mr. Khan presses that he was deprived his Sixth Amendment right to counsel in various ways. Second, Mr. Khan presents that he was deprived due process of law because of egregious prosecutorial misconduct. Finally, Mr. Khan argues that the Court lacked jurisdiction to impose judgement under criminal statutes that are void for vagueness and substantiall overbroad. Each Ground for Relief will be discussed in detail.

B.     Sixth Amendment

1.     Introduction

The Sixth Amendment guarantees that all criminal defendants will have the effective assistance of counsel to assist him throughout the proceedings pending against him. In the words of Mr. Justice Sutherland: "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel....He requires the guiding hand of counsel at every step in the proceedings against him" (Powell v. Alabama, 287 US 45, 64 (1932)).

A defendant can be deprived the effective assistance of counsel in several ways. First, and most obviously, a defendant could be deprived counsel completely (Gideon v. Wainwright 372 US 339 (1963)). He could also be constructively deprived of counsel where Counsel's ability to conduct the defense by his own strategy is taken away from him (Geders v. United States 425 US 80 (1976)). The government could also interfere with a defendant's right to counsel (Strickland v. Washington 466 US 668 (1984)). More typically in today's litigious world, counsel could simply be ineffective in their representation (Id.).

In this case, Mr. Khan alleges deprivations/abandonment of counsel, interference with the right to counsel and general ineffectiveness of Mr. Bowles, Mr. Gorence and Mr. Venie.

2.     Deprivation/Abandonment of Counsel
       (Counts I, IV, and X)

Mr. Khan was not provided counsel for his first hearing before a judicial

officer, and his attorneys abandoned him for two other hearings.

On or about May 9, 2012, a swarm of federal and state agents arrested Mr. Khan at his residence (Declaration of Erik Bilal Khan, at para 2, attached as Exhibit D). More than 24 hours later, Mr. Khan was brought before a New Mexico magistrate judge (Id. at para 28). A hearing was held that apparently denied Mr. Khan bail outright (Exhibit A at 2). Sadly, Mr. Khan was not afforded any counsel at that hearing and he had no way of obtaining counsel prior to the hearing (Exhibit D at para. 28).

The Supreme Court has held that the right to counsel attaches at "the initiation of adversary judicial proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" (Rothgery v. Gillespie, 554 US 191, 198 (2008)). The purpose of this requirement is to ensure the defendant is protected while he is "told of the formal accusation against him and restrictions are imposed on his liberty" (Id. at 194 citing Brewer v. Williams, 430 US 387, 398-99 (1977)). There is no doubt, this hearing informed Mr. Khan of the "formal accusation[s] against him" and imposed the ultimate restriction on his liberty - jail (Ex. D at para 28; Ex. A at 2).

Typically, when a case ceases to be a state case and is federally adopted, errors at the state level are of no consequence (United States v. Lepinski, 460 F.2d 234, 238-39 (10th Cir. 1972)). However, when agents of the federal government deliberately bypass more restrictive federal rules and law to access less restrictive state rules and law, Courts have found federal law violated. (see eg. United States v. Pennington, 635 F.2d 1387, 1390-91 (10th Cir. 1980) cert. denied, 451 US 938 (1981)(state warrant reviewed under Rule 41); United States v. Massey, 687 F.2d 1348, 1355-56 (10th Cir. 1982)(same); Byars v. United States 273 US 28, 33 (1927)(extending exclusionary rule to state warrant with federal involvement prior to Mapp v. Ohio, 367 US 643 (1961)); and Lustig v. United States 338 US 74, 78-79 (1949)(same)). The same logic applies here.

In this case, Homeland Security and the United States Attorney's Office were directly involved with all pre-arrest activities and had already decided to prosecute the case before Mr. Khan was even arrested. This is evident by the heavy involvement of the federal government in procuring, planning, and executing the search warrant [Doc. 118, 134, 135, 146]. The federal government's direct participation in physically handcuffing Mr. Khan also makes it abundantly clear (Ex. D at para 2). Indeed, Special Agent Legaretta was directly involved in Mr. Khan's post-miranda interview and even questioned him without Detective Thatcher present.

The next step in the analysis is to see if Mr. Khan was prejudiced by such a deprivation of his absolute right to counsel at this critical stage. Thus, the question arises: how would this have played out if Mr. Khan were presented in the federal court, without delay and provided a detention hearing as directed by the Bail Reform Act (18 USC 3141, et seq.). Under the Federal Rules of Criminal Procedure, Mr. Khan would have been brought before a federal Magistrate judge "without unnecessary delay" (Rule 5 FRCP). The federal Magistrate would then set a detention hearing to begin not later than five days following the first appearance (if the Defendant asks for a continuance) where he has "the right to be represented by counsel, and, if financially unable to obtain adequate representation, to have counsel appointed (18 USC 3142(f)(b)).

A federal first appearance is not considered a critical stage of the proceedings and does not impose a constitutional right to counsel (United States v. Perez 776 F.2d 797, 800 (9th Cir. 1985). However, the Federal Rules of Criminal Procedure do mandate the presence of counsel for first appearances (Rule 44(a) FRCP). In the District of New Mexico, it is commonplace that a Federal Public Defender is at least present for any Defendant who needs the assistance of counsel.

Evenso, the difference between the federal initial appearance and New Mexico's initial appearance is clear. In the New Mexico appearance, bail is either granted or denied at that hearing - apparently even if it isn't discussed. In the

federal system, bail would not have been dispositively determined without proper counsel (United States v. Salerno 481 US 739, 742 (1987); 18 USC 3142(f)(b)).

Had Mr. Khan been afforded counsel for his initial appearance before a New Mexico magistrate, it is virtually certain that Mr. Khan would have been afforded bail and then bailed out of jail (see: Moya v. Garcia, 2017 US Dist. LEXIS 20951 (D.N.M. Feb. 13, 2017)(Johnson, J.)(discussing the right to bail for non-capital offenses under the New Mexico Constitution); NM Const. Art. II, Sec. 13 (Protecting the right to bail for non-capital offenses)).

The United States gained a tactical advantage by allowing the State of New Mexico to arrest Mr. Khan and abstaining from federally charging him. Mr. Sinha was able to strengthen his detention case by investigating for 21 more days. Had the federal law been followed, Mr. Khan would likely have been granted bail federally as the federal magistrate relied heavily on Mr. Sinha's extra investigation.

Sadly and egregiously, the next issue that Mr. Khan presents is that his counsel abandoned him for two hearings. In this first instance, the United States decided to dismiss the first case (Ex. C at 3) and refile the verbatim criminal complaint under a new case number [Doc. 1]. Then, neither attorney attended an arraignment following the filing of a superseding indictment (Ex. D at para. 133-137). It is well settled that counsel for the defense has a duty to represent his client vigorously and loyally. When a defendant exercises his right to have a specific attorney represent him, that attorney is required to be present for any hearings required by the Court. In this case, Mr. Khan was plainly not represented during these two hearings.

At the first, an initial appearance (for the second time), the right to counsel had already attached. In the first case opened, Mr. Khan had elected to have private counsel - a right protected under the Sixth Amendment (United States v. Holloway, 826 F.3d 1237, 1241 (10th Cir. 2016)). That counsel entered an appearance

(Ex. C at 4, ln. 6 and 17). When Mr. Khan was brought before Magistrate Judge Wormuth for his second "initial" appearance, the Public Defender and the Court were informed that Mr. Khan had already retained counsel and the case had been ongoing (see Tr. of Hearing for [Doc. 5]; Ex. D at para. 68-69). Apparently, according to Mr. Bowles and Mr. Gorence, Mr. Khan did not "need [them] to hold [his] hand for that" (Ex. D at para. 69).

Then at the arraignment held on July 26, 2013 [Doc. 30], they didn't show up again (Ex. D at para. 132-139). There was a "stand-in" counsel whom Mr. Khan had never met before.

Evenso, just because **some** counsel was present does not mean that it was Mr. Khan's counsel of choice. At both hearings, neither counsel who purported to "represent" Mr. Khan had entered any appearance or knew anything about the case. There were no motions pending for the substitution of counsel. Neither of the attorneys that were in attendance were Mr. Khan's counsel of choice. Thus, they were **not** representing him (Maples v. Thomas, 181 L.Ed.2d 807, 823-24 (2012)(finding that firm did **not** actually represent habeas petitioner and excusing procedural default)).

When counsel is denied entirely during a "critical stage" of the proceedings, prejudice must be presumed (United States v. Cronic 466 US 648, 659 (1984)("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial")). While it is arguable that the second "initial" appearance does not constitutionally require counsel, an arraignment is a whole difference matter. A Defendant has a constitutional right to the assistance of counsel at the arraignment (Fellers v. United States 540 US 519, (2004)(right to counsel triggered at initiation of judicial proceedings such as arraignment); Kirby v. Illinois, 406 US 682, 689 (1972)(arraignment included in the list of five proceedings by which adversary proceedings may begin)). Mr. Khan did not waive

his right to counsel for this arraignment (cf. Anderson v. United States, 352 F.2d 945, 947 (D.C. Cir. 1965)). An arraignment is not a mere formality and Mr. Khan had a right to his counsel of choice at the arraignment. That counsel failed to attend.

Nor could counsel complain that they filed a request for waiver of physical presence of Mr. Khan [Doc. 29]. That request was filed on the same day as the arraignment - so its no wonder it was not granted prior to the arraignment - and Mr. Bowles specifically told Mr. Khan he would be present for the hearing (Ex. D at 132). There is nothing in the motion or the record to suggest that Mr. Bowles or Mr. Gorence were having some problem attending the arraignment and they did not ask for a continuance. The request for waiver of Mr. Khan's personal appearance was mooted the second the United States Marshal Service produced him for the hearing. Indeed, the Court refrained from ruling on it as Mr. Khan was present. Prejudice must be presumed in this instance.

### 3. Interference with Counsel (Counts XI, XII, and XIV)

Throughout the pendency of this case, Mr. Khan was unable to privately speak with his lawyers through the telephone or visitation. He also suffered obstructed visits, without legitimate justification, with his attorneys. Finally, the United States utilized protective orders to interfere with the preparation of Mr. Khan's defense. All of these violate the Sixth Amendment right to counsel (Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001); Maine v. Moulton, 474 US 159, 170 (1985)).

Mr. Khan was held, for the vast majority of his pretrial confinement, at the Dona Ana County Detention Center in Las Cruces, NM (see: Khan v. Barela, et al., 15-cv-1151-SMV-MV (D.N.M.)). Dona Ana County Detention Center is contracted by the United States Department of Justice (US Marshal Service) to house federal pretrial detainees and produce them for Court appearances when required. Dona Ana County Detention Center ("DACDC") does not have any way to contact and speak with attorneys in a reasonably private way; although, DACDC does state in its Adult Detainee Handbook that "legal

calls" will not be recorded or monitored without qualification [Doc. 91, Ex. 5].

The United States and the DACDC were able to obtain hundreds of recorded telephone conversations between counsel and Mr. Khan. Further, DACDC - with the consent of the Department of Justice - did not use proper visitation facilities for Mr. Khan to prepare a defense.

The record in this case already has numerous examples of the government obtaining Mr. Khan's confidential legal calls placed from DACDC [Doc. 91, 103]. Indeed, evidence shows that Mr. Sinha and Ms. Ong (the assigned prosecutors) had full access to the calls and kept them in their case file [Doc. 103 - letter in re phone calls].

Sadly, the actions of the government in this case are likely very common for all other federal pretrial detainees as well.

DACDC utilizes attorney booths that have a glass barrier and recorded/recordable phones for clients to speak with their attorneys. The booths are not sound proofed and other inmates can hear both sides of the conversation (Ex. D at para 26, 64) and Mr. Khan was told "to not say much as the phones in the obstructed booths can be monitored and/or recorded" (Id. at para 64).

"The Supreme Court has recognized, "to deprive a personal of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself" (Moulton, supra. as quoted in Fraser, supra.). As the Eighth Circuit has stated: "Pre-trial detainees have a substantial due process interest in effective communication with their counsel....When this interest is inadequately respected during pre-trial confinement, **the ultimate fairness of their eventual trial can be compromised** (Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1988)).

Courts, obviously, are not prison managers. However, "where, as here, a prisoner alleges that a particular restriction imposed upon him by the prison officials impinges upon his exercise of constitutionally guaranteed rights, it is incumbant on [the Courts] to carefully scrutinize the effect of the restrictions" (Id. (internal

citation omitted)).

As a threshold matter, the Court may believe that conditions of confinement are not issues for 2255. However, in Heck v. Humphrey, 512 US 477, 486 (1994), the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness **would render a conviction or sentence invalid** [the conviction/sentence must be] called into question **by a federal court's issuance of a writ of habeas corpus...**" (emphasis supplied). Thus, certain conditions of confinement claims **must** be raised in habeas corpus proceedings to move toward the issue of money damages in a Section 1983 suit (Id at 487).

Here, Mr. Khan alleges that he was actively prevented from properly communicating with counsel during the pre-trial and post-plea portions of his case. This calls into question the overall fairness of the trial process (Moulton, supra.).

Having determined that these conditions of confinement are cognizable in a 2255 proceeding, the next question turns on whether the prison officials and the Department of Justice had some justifiable reason for imposing such an extreme restriction (Turner v. Safely, 482 US 78, 89 (1987)(defining and implementing the "reasonable relationship" standard)). There is nothing that DACDC or the Department of Justice could possibly say to prevent officers of the Court from meeting with clients and/or speaking to them on the telephone privately in the name of security. Indeed, DACDC allows religious volunteers into the housing area of the facility and further allows for public tours on a weekly basis of the entire facility. Recording phone calls between Mr. Khan and his counsel, turning them over to prosecutors, not informing him or defense counsel that it was occurring, and obstructing attorney visitation to prevent the passing and review of thousands of pages of paper discovery is flatly absurd.

If that weren't bad enough, Mr. Sinha and Ms. Ong tricked the Court into issuing an "unopposed" protective order that prevented Mr. Khan from privately

possessing ANY of the discovery in the case [Doc. ____; Protective Orders were filed under seal, and Mr. Khan is not able to secure the exact cite]. Mr. Sinha and Ms. Ong drafted a motion asking to protect the identity of the informant from disclosure in the jail setting. However, the order that counsel submitted went much further than just to protect the identity of an informant; it prevented Mr. Khan from preparing a defense and communicating with defense counsel. (The fact that defense counsel did not object to this will be presented in the general ineffectiveness section below).

Prejudice should be presumed in this instance. In Strickland v. Washington, 466 US 668, 686 (1984), the Supreme Court recognized there are certain occasions where prejudice should be presumed. Specifically, the Court stated that "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense (Strickland, supra. citing Geders v. United States, 425 US 80 (1976)). Geders is instructive here. In Geders the Court found that a bar on attorney and client consulting during an overnight recess between the defendant's direct and cross-examination (Geders at 88). Here, Mr. Khan was not able to learn of the alleged "facts" (which were continually false) to even explain to counsel the errors or Mr. Khan's version of events. Sure, the order allowed for counsel to bring the thousands upon thousands of pages of discovery to DACDC and watch Mr. Khan go through them. However, that is the most ridiculous concession to even consider. Mr. Sinha and Ms. Ong were well aware that defense counsel were located hours away from Mr. Khan and that DACDC only had obstructed visits with Mr. Khan. There was no possible way Mr. Khan could have gone through the thousands of pages of discovery during short visits with counsel - and it is unreasonable to think otherwise.

"[A]lthough counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry

into the actual conduct of the trial is appropriate" (United States v. Cronic, 466 US 648, 659-60 (1984)).

Even if a prejudice analysis is warranted, Mr. Khan was prejudiced by the intrusion into his attorney client relationship. He was unable to properly speak with his lawyers about the facts, and their inability to learn the facts is evident throughout their woefully ineffective representation. Furthermore, Mr. Sinha and Ms. Ong learned crucial details of Mr. Khan's defensive strategies and also learned Mr. Khan's posture in the case - i.e. he intended to plead guilty no matter what happened. Obviously, this affected plea negotiations and the eventual suppression hearing.

It is clear that Mr. Khan was deprived his Sixth Amendment right to counsel due to impermissable interference. The sad reality is, this has been occurring without question in the Las Cruces Division for many years without inquiry or concern. The defense bar should have certainly said something to the Court - as the Court is likely not aware of these issues. This Court should be especially appalled given the high number of convictions it processes. Over 15,000 sentencings have been processed through this Court's docket since the Court took the bench in 2001. It is said to be the highest judicial load in the nation. How many of those convictions were obtained while defendants were held at DACDC? Obviously, not all, but certainly a lion's share.

Recently, in the highly publicized case of "El Chapo" Guzman, a Court was concerned with Mr. Guzman's inability to communicate about discovery matters with an obstruction between counsel and client (a glass partition). Despite the Metropolitan Corrections Center's concern of Mr. Guzman's substantial connections to the underworld, the Court ordered officials to allow Mr. Guzman to have contact visits with counsel (this was reported by national news centers and a published opinion is not available as of yet on the BOP LEXIS law library system to provide a cite or quote). It is terrible that the defense bar out of the Las Cruces division feels it cannot litigate this issue in this Court.

## General Ineffective Assistance of Counsel
## (Counts V-IX, XIII, and XV-XVI)

### a. Introduction

Since the inception of this case, Mr. Khan has had six lawyers represent him. Immediately following his arrest and through his detention hearing, D. Chipman Venie of the Freedom Law Center in Albuquerque, New Mexico represented Mr. Khan. After it became apparent that Mr. Venie was not pursuing Mr. Khan's interests appropriately or vigorously, Mr. Khan retained Robert Gorence of Gorence & Oliveros and Jason Bowles of The Bowles Law Firm, both out of Albuquerque, New Mexico. Sadly, the case took serious turns for the worse, and it became utterly apparent that defense counsel was a big part of the blame.

After entering a plea of guilty, Mr. Khan retained the services of Alan Ellis, a highly respected sentencing mitigation expert that specializes in federal criminal cases. Mr. Ellis began working with Mr. Bowles and Mr. Gorence only to find that Mr. Gorence was hardly ever available and did not seem interested in the case, and Mr. Bowles was acting like a bull-in-a-china-shop. Indeed, Mr. Bowles attempted to sabotage a meeting between Mr. Ellis and Ms. Ong by claiming that Mr. Ellis was no longer on the case.

Ms. Ong contacted Mr. Ellis to determine if this was true, and Mr. Ellis then had to direct Mr. Bowles and Mr. Gorence to cease all contact with the United States Attorney's Office with regard to Mr. Khan's case. Mr. Ellis then reached out to local attorneys and found that Nancy Hollander and Vincent Ward of the highly respected firm of Freedman, Boyd, Hollander, Urias, and Ward were willing to represent Mr. Khan's interests.

Mr. Ward, for all intents and purposes, became the primary counsel for Mr. Khan and investigated the case. It became apparent that there were numerous errors committed and those errors had a deleterious effect on Mr. Khan's defense case. Mr. Ward and his team, including Mr. Ellis and members of the Law Offices of Alan Ellis, attempted to undo the damage. For instance, Mr. Ward filed a Motion to Reconsider the

denial of the motion to suppress for Fourth Amendment violations [Doc. 125, 134, 135, 146]. The Court denied the motion and decided that it would be better presented in a 2255 ineffective assistance of counsel claim. The Court was concerned that a proper evidentiary hearing would not occur if the issues were litigated outside of the 2255 process [Doc. 159].

Since the conclusion of the case, Mr. Khan has discovered a number of errors that were prejudicial to him, each in their own right and also cumulatively. Specifically, Mr. Khan did not receive adequate or effective counsel at his initial arraignment on the original indictment or with the presentment of a plea agreement. Further, counsel failed to investigate myriad factual and legal issues. Counsel further operated under an actual conflict of interest, waived Mr. Khan's statutory speedy trial rights without his consent, failed to raise a colorable constitutional challenge to the statutes of conviction, and approved an overly expansive protective order without review or objection. Each of these issues will be discussed seriatim.

### b. Legal Standard

The now familiar test announced in Strickland v. Washington, 466 US 668, 687-88 (1984) holds the standard for ineffective assistance of counsel claims. The Defendant/Petitioner has to meet two demands. "First, Petitioner must show that counsel's performance was deficient because if fell below an objective standard of reasonableness....[and s]econd [he] must show that counsel's deficient performance prejudiced him (Valencia v. United States 2016 US Dist. LEXIS 139903 (D.N.M. Jun 8, 2016)(Garza, M.J.); Sandoval v. Ulibarri 548 F.3d 902, 909 (10th Cir. 2008) cert. denied 130 S.Ct. 133 (2009)). The "Petitioner must satisfy both prongs of Strickland" (Id.).

When evaluating Counsel's performance under the first prong of the analysis, the Court must be highly deferential to defense counsel's decisions. The "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (Strickland, supra at 689). The court must evaluate

counsel's performance, however, under a totality of the circumstances (Id. at 688).

With regard to prejudice, Petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (Id. at 694). A "reasonable probability is a probability sufficient to undermine confidence in the outcome" (Bonney v. Wilson, 754 F.3d 872 (10th Cir. 2014) quoting Strickland, supra., at 694)).

### c. D. Chipman Venie, Esquire

Mr. Venie provided ineffective assistance of counsel in several ways. First, he never investigated the government's factual claims that resulted in a denial of release, he never attempted to rebut the presumption in favor of detention, and failed to open negotiations with the United States Attorney's Office. He also failed to inform Mr. Khan of his right to appeal the magistrate's detention ruling (Ex. D at pp. 3-6; See also, Opening Motion to Vacate at Attachment 1, Ground I, Counts II-III), a right Mr. Khan would have exercised to the fullest (Opening Motion to Vacate at para. 44).

"The Sixth Amendment imposes a duty on counsel 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary'" (Hanson v. Sherrod, 797 F.3d 810, 830 (10th Cir. 2015), quoting Strickland supra., at 691). However, a "decision not to investigate cannot be deemed reasonable if it is uninformed" (Heard v. Addison, 728 F.3d 1170, 1180 (10th Cir. 2013) accord Strickland, supra. at 691).

Here, Mr. Venie didn't prepare even slightly for the detention hearing. To begin, he presented the factual claims to Mr. Khan **minutes** before the hearing began (Opening Motion at para. 26). There is no possible way that Mr. Venie could have investigated the claims made by Mr. Sinha in his affidavit or motion. Indeed, Mr. Khan asserts that many of the claims made by Mr. Sinha were either false or misleading. Had Mr. Venie taken the time to conduct a minimal investigation (ie. meeting with Mr. Khan), he could have presented rebuttal evidence.

At that same hearing, it is apparent that Mr. Venie did not investigate the law (Heard, supra at 1179 ("[Counsel] has a duty to conduct reasonable investigations...which extends to the law as well as the facts"). Thus, "counsel is obligated to research the relevant law to make an informed decision whether certain avenues with prove fruitful" (Id.).

There is no question that Mr. Venie did not investigate the law as it pertained to a detention hearing. He did not file any responsive pleadings, he did not attack the presumption of detention, and he plainly thought that there were no appellate options for Mr. Khan to invoke. Indeed the plain language of the statute shows that there is a presumption offenses alleged under section 2252 (18 USC 3142(e)(3)(E)) and offenses alleged that carry a term of imprisonment of greater than 10 years (Id at (e)(3)(A)), "it shall be presumed that no condition or combination of conditions will reasonably assure" the defendant's appearance and community's safety (Id.). Had Mr. Venie read this statute, he would have found his job was a lot harder than a simple bail argument that is typical of New Mexico state courts, where the accused of non-capital crimes is virtually guaranteed bail (NM Const. Art. II, Sec. 13; Moya, supra.).

Further, Mr. Venie implicitly advised Mr. Khan there were no options for review or appeal. Had Mr. Venie been in a state court, he would probably be correct. However, under FEDERAL law - which was the operative law - Mr. Khan was statutorily entitled to review and possible appeal of the detention order (18 USC 3145). When determining whether there is ineffective assistance regarding an appeal is usually per se ineffective assistance of counsel (Roe v. Flores-Ortega, 528 US 470, 476-77 (2000)). However, when the defendant did not convey his wish to appeal one way or the other, then the Court must look to "whether counsel had an affirmative duty to consult with the defendant concerning an appeal" (Pahcheka v. Ward, 143 Fed. Appx. 128, 133 (10th Cir. 2005)(unpublished) accord Flores-Ortega, supra.). That duty is determined "when there is reason to think that either (1) that a rational defendant would want to appeal... or

(2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing" (Id. (emphasis removed)).

Obviously, Counsel misadvised Mr. Khan by telling him there was no possible way to appeal the detention order. Thus, there is no possible way that Mr. Khan could have demonstrated his interest in appealing. Thus, we look to whether a "rational defendant" would want to appeal.

In this case, Mr. Khan had ties to the community, had a willing third party to accept care and responsibility of him, had volunteered to enter a residential treatment program, and had never had any legal troubles in the past. These were solid reasons to demonstrate that Mr. Khan was amenable to pretrial release - whether in a halfway house or treatment center or under direct supervision. He would have further been placed on a GPS monitor (18 USC 3142(c)(1)(B)). These are solid reasons to grant release pending trial.

Mr. Venie was also deficient for not approaching prosecutors to resolve the case. Mr. Venie advised Mr. Khan to sign the "Ends of Justice" agreement to waive presentment time limits in return for early release of the discovery and to opening pre-indictment plea negotiations. Mr. Khan had confessed to criminal wrong doing and told Mr. Venie that he wanted to resolve the case as fast as possible. Mr. Khan was obviously interested in pre-indictment plea negotiations as he signed the waiver of the preliminary hearing and presentment. Then Mr. Venie just plainly did nothing. He never contacted the prosecution for the discovery or to offer any plea agreement. Clearly, Mr. Venie's conduct fell below an objective standard of reasonableness.

The question then turns on prejudice. Of course, had Mr. Venie followed the agreement for the waiver, it is highly likely the United States would have negotiated some form of plea to the initial complaint of three charges. It is further highly likely that Mr. Khan would not have been stuck in DACDC for over 4 years and would have most certainly received less than 20 years imprisonment with LIFE supervised release.

Clearly, Mr. Venie provided ineffective assistance of counsel in contravention of the Sixth Amendment.

### d. Jason Bowles and Robert Gorence

After it became clear that Mr. Venie was not representing Mr. Khan in a proper way, Mr. Khan retained Jason Bowles and Robert Gorence (Opening Motion at para 71-73). Prior to their retention, Mr. Khan met with Mr. Gorence at DACDC (Ex. D at para 64-66), complete with the interference and recorded phone previously discussed (see Sec. IV.B.3, supra.). This meeting established that Mr. Khan elected to have Mr. Gorence and Mr. Bowles represent him and they would work vigorously to achieve a result that would close the case as fast as possible. During the course of their representation, Mr. Bowles and Mr. Gorence constitutionally failed Mr. Khan in a number of ways.

### i. The Arraignment

On or about November 14, 2012, a grand jury sitting in the District of New Mexico returned an indictment alleging Mr. Khan violated three child pornography trafficking laws (Opening Motion at para. 85; [Doc. 7]. On or about November 20, 2012, an arraignment was held pursuant to Rule 10 of the Federal Rules of Criminal Procedure before Honorable Magistrate Judge S. Vidmar [Doc. 10]. As is typical of any arraignment, Mr. Khan was asked if he understood the indictment. However, that is where typicality ended.

Immediately prior to the arraignment proceeding coming to a start, Mr. Khan specifically asked Mr. Bowles if he could simply plead guilty to the indictment (Opening Motion at para. 90-91; Ex. D at para. 82-87). Mr. Bowles informed Mr. Khan that he is not permitted to plead at the arraignment (Id.). During the hearing, the Court asked Mr. Bowles to enter the plea and not Mr. Khan (Ex. D at para 88-89; Opening Motion at para. 93). Nobody explained to Mr. Khan that he in fact could plead guilty to the indictment at that time (Id.). Mr. Khan asserts this erroneous interpretation of the law caused Mr. Khan to not plead guilty and the misadvice prejudiced him severely.

"A [criminal] defendant...has the ultimate authority to determine **whether to plead guilty**, waive a jury, testify in his or her own behalf, or take an appeal" (United States v. Oakes, 680 F.3d 1243, 1248 (10th Cir. 2012) quoting Florida v. Nixon, 543 US 175, 187 (2004)(emphasis added)). "These four decisions naturally reside with the defendant because they implicate the two most basic tenets of our legal system..." (Id.) Thus, for a defendant to enter a dispositive plea, he "must have a full understanding of what the plea connotes and of its consequences" (United States v. Marceleno, 819 F.3d 1267, 1276 (10th Cir. 2016)). When a counsel takes away the ability for the defendant to decide one way or the other, reversible error has been found (see eg. Missouri v. Frye, 182 L.Ed.2d 379, 390 (2012)(holding that failure to communicate a plea offer is per se ineffective); Cannon v. Mullin, 383 F.3d 1152, 1171 (10th Cir. 2004)(re-affirming that the defendant makes the decision of whether or not to testify, even if doing so is "suicidal trial strategy")).

Where the Constitution protects a right in one direction, it also protects it in the other direction. For instance, in Faretta v. California, 422 US 806, 819 (1975) the Supreme Court recognized that the Constitution not only guarantees a right to effective defense counsel, but also for a defendant to proceed Pro Se:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.

(Faretta, supra. at 819). Similarly, in Rock v. Arkansas, 483 US 44, 52-53 (1987) the Supreme Court reminded:

> The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against testimony...Every ciminal defendant is privileged to to testify in his own defense, or to refuse to do so.

Likewise, a defendant has a right to be placed in a position to make a choice of whether or not he will accept a plea agreement (Frye, supra.), he also has the right to choose to enter a plea of his choice at an arraignment.

Indeed, the Federal Rules of Criminal Procedure spell out that a defendant, not the attorney, should be asked by the Court to enter the plea (Rule 10(a)(3) FRCP). Of course, the Rule also provides a contingency of when a defendant, who has the right to always remain silent, refuses to enter a plea to the indictment; the Court will automatically enter a plea of not guilty (Rule 11(a)(4)).

"A defendant may plead not guilty, guilty or (with the court's consent) nolo contendere" (Rule 11(a)(1) FRCP). Here counsel informed Mr. Khan he could NOT enter any plea and there was no reason to question that statement. Indeed, the Court did not address the Defendant with regard to his plea at all, as the Rule requires (Rule 10(a)(3)). Counsel effectively removed Mr. Khan's right to decide, knowingly and voluntarily, "whether [or not] to plead guilty" (Oakes, supra.). Just like the failure to communicate a plea offer, this should be considered Per Se ineffective assistance of counsel.

Even if the Court were to evaluate prejudice, such an analysis reveals that Mr. Khan was prejudiced by this. To begin, Mr. Khan unequivocally asserts that he wanted to plead guilty as fast as possible and he would have done exactly that if given the correct information (Ex. D at para. 92; Opening Motion at para. 95). Mr. Khan is under no obligation to show anything than there is a reasonable probability that the arraignment would have turned out differently. To be sure, when a defendant must show prejudice with the entry of a guilty plea, he need not show that he would have prevailed at trial but that "he would not have pleaded guilty and would have insisted on going to trial" (United States v. Clingman, 288 F.3d 1183, 1186 (10th Cir. 2002)). The same logic is equally applicable here.

Evenso, Mr. Khan can show that his eventual sentencing hearing would have likely been very different. In the end, Mr. Khan accepted a plea for 20 years incarceration with lifetime supervised release. Had Mr. Khan pleaded guilty at his arraignment, there is more than a reasonable probability he would have fared far better.

"[A]ny amount of actual jail time has Sixth Amendment significance" (Glover v. United States, 531 US 198, 203 (2001)). Had Mr. Khan pled guilty at the arraignment, he would not have been charged with Attempted Production of Child Pornography; especially considering that charge came months later and vindictively following the rejection of an absurd plea agreement (Exhibit E - Emails between Mr. Bowles and Ms. Ong). That single charge resulted in multiple groups under 3D1.1 of the United States Sentencing Guidelines. This added a level to Mr. Khan's final offense level. While he was awarded a three point reduction for acceptance of responsibility, he could have moved for a Downward Departure for super acceptance of responsibliity. Further, his statutory maximum would have been 50 total years, as opposed to 80 and his mandatory minimum would have only been 5 years. Mr. Khan would have been in a far better sentencing position. Finally, Mr. Khan's final offense level would have only been 39 as opposed to 43 after a 3 point acceptance award.

Obviously, that sentencing hearing would have produced numerous arguments for downward variances as the guideline itself is under constanct attack. For instance, Judge Black of this District granted a downward variance stating that the use of a computer enhancement under 2G2.2(b)(6), inter alia, "is a little like penalizing speeding, but then adding an extra penalty if a car is involved" (United States v. Kelly 868 F.Supp.2d 1202, 1209 (D.N.M. 2012)(Black, J)).

It is clear that Mr. Khan was deprived the effective assistance of counsel at his arraignment.

## ii. Presentment of Plea Agreement

The Court is already aware that the government did make a plea offer to Mr. Khan. The government offered 22-years of imprisonment in exchange for Mr. Khan's guilty plea. The issue here is not the offer itself (that will be discussed later), the issue is how Mr. Gorence presented Mr. Khan's available options. Indeed, Mr. Gorence did not inform Mr. Khan of **all** of his options and this prejudiced Mr. Khan.

Mr. Gorence went to DACDC and communicated the plea offer to Mr. Khan (Ex. D at para. 112), and stated there was a plea offer of 22-years (Id. at para 113), Mr. Gorence never went through all of Mr. Khan's available options (Id. at para. 115-117). Most importantly, Mr. Gorence explained only two options to Mr. Khan - ie. that he can accept or reject the proposed offer (Id.). He never explained to Mr. Khan a third option; to reject the plea offer and enter an open plea to the current indictment (Id.). Had Mr. Gorence explained this last option in any way, there is a highly likely probability Mr. Khan would have chosen that option (Id. at para. 92-93; Section 4.d.i, supra.).

> [O]urs is for the most part a system of pleas, not a system of trials, it is insufficient simply to point to the guarantee of a fair trial as a backstop that innoculates any errors in the pretrial process...

(Frye, supra. at 389-90). It is not enough that counsel simply state that some offer was made by the government; counsel also must give the defendant all of his available options so he can make a reasoned decision one way or the other (Smith v. United States 348 F.3d 545, 554 (6th Cir. 2003); Herring v. Estelle, 491 F.2d 125, 128 (5th Cir. 1974) accord Lafler v. Cooper 182 L.Ed.2d 398, 411 (2012)).

The prejudice suffered by Mr. Khan is the same as the prejudice suffered by Mr. Bowles' inaccurate understanding of the arraignment proceedings (Section 4.d.i, supra.). It is virtually certain that Mr. Khan would not have suffered a superseding indictment alleging a violation of law with a 15 year mandatory minimum sentence. Nor would Mr. Khan have had to sit in one of the worst county jails in America to await the disposition he always intended to take - pleading guilty.

Mr. Gorence had a duty to explain to Mr. Khan **all** of his options when he presented the plea agreement. By not doing this, he removed Mr. Khan's "ultimate authority to determine whether to plead guilty" (Oakes, supra.). This error prejudiced Mr. Khan and resulted in a very draconian sentence because of his failure.

### iii. Failure to Investigate

Mr. Bowles and Mr. Gorence authored and litigated two substantive motions to suppress. One of those motions should never have been filed and the other failed to address the true issues. Both of these errors were caused by Mr. Gorence and Mr. Bowles' collective failure to investigate the facts and law.

"A criminal defense lawyer has a duty to conduct reasonable investigations into [his] client's case, **which extends to the law as well as the facts** (Heard, supra. at 1179). "But a decision not to investigate cannot be deemed reasonable if it is uninformed" (Id. at 1180, internal citation and brackets removed).

To begin, Mr. Bowles and Mr. Gorence failed to raise numerous non-frivolous issues with regard to the motion to suppress for Fourth Amendment violations [Doc. 31, 39, 48]. This issue has been fully briefed by substitute defense counsel in a Motion to Reconsider [Doc. 118, 125, 134, 135, 146]. However, the Court never reached the merits of the issues choosing to wait for 2255 proceedings so a proper evidentiary hearing could be held [Doc. 159]. Thus, Mr. Khan incorporates the original briefing in full and asks the Court to consider all the briefs filed to be considered with the Motion to Vacate as if they were all attached herein.

There is one issue that was not briefed previously regarding the affidavit for search warrant. Within the Motion to Reconsider, there is a credible allegation to warrant a hearing pursuant to Franks v. Delaware, 438 US 154, 171 (1978). It is clear that Detective Thatcher lied throughout her affidavit and these lies were germane to the determiniation of probable cause [Doc. 118, 125, 134, 135, 145].

Notably, Det. Thatcher made the errorneous claim that the Child Protection System was owned and maintained by a government agency. Insodoing, Det. Thatcher created a presumption of governmental reliability which would trigger the collective-knowledge doctrine (United States v. Wilkinson, 633 F.3d 938, 941 (10th Cir. 2011)). Det. Thatcher effectively removed the Magistrate's questions of the veracity of a claim made by an annonymous informant. Indeed, Mr. Khan's defense team discovered that the

Child Protection System is neither owned/operated by a governmental agency nor is reliable for tracking whether computers have in fact captured or distributed child pornography files [See Doc. 118, 125, 134, 135, 146].

> Certainly, the basis of a[n] [] informant's knowledge, as well as his reliability, are important factors in deciding whether information in an affidavit supports a finding of probable cause for a search....[C]ourts reviewing the alleged omission of information bearing on an informant's credibility ask whether, assuming the magistrate judge had been apprised of the omitted information, the judge still would have found probable cause to issue the search warrant. In asking this question, it is important to keep in mind that a magistrate judge's task in determining whether probable cause exists to support a search warrant is simply to make a practical, common-sense decision whether, given all the facts and circumstances set forth in the affidavit before him, including the veracity and basius of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

(United States v. Avery, 295 F.3d 1158, 1167-68 (10th Cir. 2002).

The only information that Det. Thatcher presented of any investigation into her claims was about the Child Protection System's reliability. Had the magistrate been informed that it was managed and operated by a private company - that is now defunct -and had serious reliability questions, the magistrate probably would not have issued the warrant without a further independent investigation by the police. This is just another example of Mr. Bowles and Mr. Gorence's failure to investigate the facts and law surrounding the Motion to Suppress for violations of the Fourth Amendment.

With regard to the Sixth Amendment suppression motion, the motion should never have been filed. Not only did the violations of Mr. Khan's right not affect the case at hand, filing the motion opened a door for the government to make substantive claims about Mr. Khan's character to the Court. Sadly, the claims were false, and Mr. Bowles and Mr. Gorence never investigated those claims or attempted to rebut them. y

Mr. Gorence and Mr. Bowles filed a motion to suppress statements allegedly made by Mr. Khan to a confidential informant while confined at DACDC [Doc. 22, 32]. Counsel opined that the statements the government obtained were the basis for alleging a count of attempted production of child pornography in violation of 18 USC 2251 (Ex. D at para. 119-120). Despite Mr. Khan vehemently and consistently denying that he ever made the alleged incriminating statements to the informant, Mr. Gorence and Mr. Bowles NEVER listened to the actual tapes of the conversations captured by the government. This was apparent in Mr. Bowles and Mr. Gorence position that the statements needed to be suppressed [Doc. 22, 32]. The government made abundantly clear that the basis for the added charge had to do with a conversation discovered that Mr. Khan had with an "unknown" party that the government alleged Mr. Khan "believed" was a minor between 2009 and 2010. The discovery that Mr. Bowles and Mr. Gorence would not let Mr. Khan possess, made that very clear - so it was obvious they did not even look through the discovery.

Sadly, the filing of this motion allowed the government to openly make the allegations that Mr. Khan was a "serial" child molester who galvanted around the globe producing child pornography and making money doing it [Doc. ____ - Government's response to Doc. 22 which was filed under seal and unavailable to Mr. Khan]. The fact that the government was able to even make these utterly false claims, without rebuttal, was likely the most damaging event throughout the entire case. Indeed, the Court assumed the allegations were true for the purposes of its Memorandum Opinion and Order denying the Motion; the Court's listing of these utterly false facts took up the majority of the MOO [Doc. 56].

Counsel should have listened to the tapes **before** deciding if filing a motion to suppress for the alleged violation of Mr. Khan's Sixth Amendment rights was appropriate. The tapes made abundantly clear the Mr. Khan **never made any of the claims** the government claimed were made. Further, had they listened to the tapes, they would have absolutely found that Mr. Khan never made any incriminating comments that could

have been used by the government to prove any part of their case. It is patently unreasonable that counsel never investigated the only piece of evidence in the government's possession to determine what was and was not said by Mr. Khan. Indeed, Mr. Khan made an unequivocal assertion to the informant that he never abused any child and would vehemently contest any claim made to the contrary (*The tapes and transcripts are in the government's and defense counsel's possession. Because of the protective orders, Mr. Khan is not allowed to possess them and asks the Court to order them produced for this 2255 proceeding).

Again, a "decision not to investigate cannot be deemed reasonable if it is uninformed" (Heard, supra.). It is absurd that counsel failed to investigate the facts surrounding the claims being made by the government, but it is even worse that counsel truly did not investigate the law as it surrounded their claim.

> The extent to which counsel will be obligated to research the law in order to perform at a constitutionally adequate level of competency will vary case by case: as the Supreme Court observed in Strickland, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation" Strickland, 466 US at 690-91.

(Heard, supra. at 1180).

The Court probably recalls that Mr. Bowles stuggled greatly during oral argument in explaining the relationship of Texas v. Cobb, 532 US 162, 164 (2001). Indeed, there is no doubt that had Mr. Khan been openly charged with the allegations that the informant claimed Mr. Khan confessed to, Moulton would have applied to his case. But, the allegations set forth again had nothing to do with the case before the Court and thus did not apply. Thus, the Court obviously ruled against the defense with this claim citing Cobb. Indeed, the Court admonished Mr. Bowles for not briefing about

Cobb and of the Court's previous decision reversed by the Tenth Circuit on point [Doc. 68]. The motion was frankly frivolous and only opened the door to damage Mr. Khan's character and credibility with the Court. Therefore, it was ineffective assistance of counsel for Mr. Bowles and Mr. Gorence to waste resources and litigate this motion.

### iv. Conflict of Interest

It is well settled, criminal defendants are guaranteed the "right to representation that is free from conflicts of interest" (United States v. Flood, 713 F.3d 1281, 1286 (10th Cir. 2013) quoting Wood v. Georgia, 450 US 261, 271 (1981)). The Tenth Circuit has recognized that the typical prejudice inquiry of ineffective assistance claims is not required if the Petitioner can "demonstrate[] that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected [his] lawyer's performance" (Flood, supra.).

Here, Mr. Khan was completely unaware that his former employer was respresented by Mr. Gorence and Mr. Bowles to protect them from any future governmental investigations that could spill over to the company (Ex. D at para. 167-173; Opening Motion at para. 181-204). The concern for the company's potential criminal and/or civil liability was of utmost concern to Mr. Gorence and Mr. Bowles and only became apparent late into their representation (Id.). It is clear that Mr. Gorence and Mr. Bowles utilized their position as defense counsel to protect their first client, not Mr. Khan. Thus, there was an actual conflict of interest during the course of Mr. Gorence and Mr. Bowles representation.

This is likely the reason neither of them informed Mr. Khan could plead guilty without the "benefit" of a plea agreement. It is no wonder neither of them raised the most egregious issues related to the search warrant. And it is obvious why both of them had zero problem with Mr. Khan's character and credibility being destroyed by their handling the informant issue.

### v. Waiver of Speedy Trial

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial..." (US Const. Amend. VI). In an effort to ensure that defendants rights to a speedy trial remain inviolate, Congress enacted the Speedy Trial Act of 1974 (18 USC 3161, et seq.). The Act provides for exceptions to various time limits it sets. Whenever a defendant waives a right embodied in the Constitution or statute, that waiver must be entered into knowingly and voluntarily (United States v. Jim, 786 F.3d 802, 810 (10th Cir. 2015)(waiver of guilty plea must be knowing and voluntary); United States v. Hahn, 359 F.3d 1315, 1327 (appeals/collateral attack may be waived knowingly and voluntarily); United States v. Ruiz, 536 US 622, 629-30 (2002)(right to receive exculpatory impeachment material may be knowingly and voluntarily waived); United States v. Ochoa-Equiha 2010 US Dist. LEXIS 103379 (D. Kan. 2010) aff'd 414 Fed. Appx. 174, 175 (10th Cir. 2011)(unpublished)(waiver of collateral attack rights under 2255 enforceable if knowing and voluntary)).

Indeed, when a right is protected by the Constitution, it has been generally found to be a right that only the defendant himself may waive (Bonney v. Wilson, 754 F.3d 872, 883 (10th Cir. 2014)(entry of guilty plea, and thus waiver of trial, is a defendant's personal choice); United States v. Taylor, 492 Fed. Appx. 941, 945 (10th Cir. 2012)(unpublished)(defendant retains the right to choose to testify in his defense even "when doing so is suicidal trial strategy"); Faretta 422 US at 835 (a defendant can "knowingly and intelligently" waive his right to the assistance of counsel for his defense)). The point is, any time there is to be a waiver of a "known right or privilege" (Johnson v. Zerbst 304 US 458, 464 (1938)), the DEFENDANT himself must knowingly and intelligently waive it himself. In this instance, Mr. Bowles and Mr. Gorence waived Mr. Khan's rights under the Speedy Trial Act and the Sixth Amendment without inquiry.

The motion to declare the case complex came more than seven (7) months following Mr. Khan's arrest. The government was already done investigating their case

in chief and merely wanted extra time to pad their case with manufactured "evidence". Thus, there really was no qualified reason to grant a complex case continuance pursuant to 18 USC 3161(h).

Mr. Bowles and Mr. Gorence's failure to ask Mr. Khan if he voluntarily waived such an important right resulted in prejudice as well. First, if a trial was properly set, Mr. Bowles and Mr. Gorence would have been forced to discuss Mr. Khan's option to plead without the "benefit" of a plea agreement (cf. Sec. B.4.d.i-ii). Thus, if the right was not waived by counsel without consent, the prejudicial error claimed about above (Id.) would have been corrected. Second, the government would not have been given an absurd amount of time to galavant across the Southwest merely to pad their case with manufactured information (that was completely false) to annihilate whatever was left of Mr. Khan's character and credibility (see. Sec. 2.b, supra.).

Mr. Bowles and Mr. Gorence were constitutionally obligated to ask Mr. Khan if he wanted to oppose the waiver of his rights under the Act.

It must be noted that Mr. Khan does not need to show he would have prevailed with litigating the issue. He merely must show that he would have insisted on trying to preserve his rights (Clingman, supra.). There is a reasonable probability that Mr. Khan would have insisted on attempting to preserve his rights had Counsel consulted with him.

### vi. Protective Order

The Court is well aware there are several protective orders in this case (see eg. Sec. B.3 at pp. 13-14 supra.). Indeed, Mr. Khan has still NEVER seen the protective orders in this case despite asking for them. However, Mr. Khan is well aware of their reach and errors associated with them.

The issue here is with the first protective order. Mr. Gorence and Mr. Bowles apparently did not oppose the entry of a protective order to protect the identity of the confidential informant who was being employed by the government. Agreeing to such an order is reasonable. However, the Order issued by the Court went well beyond

what was agreed to and completely prevented Mr. Khan from properly reviewing the discovery and claims made by the government. Indeed, the Order interfered with Mr. Khan's right to counsel (Sec B.3, supra.).

The problem here is that Mr. Bowles and Mr. Gorence approved the proposed Order submitted to the Court **without ever reading it**. Then when it was filed, they never objected stating the agreement was not nearly as expansive as the Order claimed. Indeed, the government's motion specified that the nature of the order was to protect the informant from coming to harm while incarcerated. Failure to read the Order they were approving was patently <u>un</u>reasonable.

The prejudice is clear. Mr. Khan was **prevented** from communicating with is attorneys about his version of events or provide details to rebut the government's "factual" claims.

In United States v. Aranda-Diaz, Judge Browning discussed the effect to expansive of a protective order can have on a defendant to prepare his defense. Thus, in that case Judge Browning modified a protective order regarding a confidential informant and recognized that "[t]he Court should not [] construct a firewall between [a defendant] and his counsel that would seperate [a defendant] from the information that is important to his constitutional right to a meaningful opportunity to present a complete defense" (Aranda-Diaz, 2014 US Dist. LEXIS 2242 (D.N.M. Jan. 7, 2014)(Browning, J.)).

That is precisely what happened here. Mr. Khan was subjected to a "firewall" that prevented him from accessing the information to present a complete defense. And this happened because Counsel failed to simply verify that the government presented a proposed order that was narrow and reasonable. Judge Browning's concern in Aranda-Diaz has been proved in this case. This situation made it impossible to "any lawyer, even a fully competent one" to provide the effective assistance of counsel (Cronic, supra.) and the situation was **created by defense counsel**. There can be no doubt that such conduct

qualifies as deficient performance under <u>Strickland</u>.

### vii. Failure to Raise Constitutional Challenges

This issue is tied to Mr. Khan's jurisdictional claims. Inasmuch as the failure to raise the issues was ineffective assistance of counsel will be discussed in that section. Please refer to Sec. VI.D., infra.

### e. Prejudice

While Mr. Khan addressed prejudice with regard to each error individually, the Court is obligated to evaluate prejudice cumulatively. As the Tenth Circuit stated:

> [O]ur decision to grant relief on ineffective assistance grounds is a function of the prejudice flowing from all of counsel's deficient performance-as <u>Strickland</u> directs it to be. [(]See <u>Strickland</u>, 466 US at 694-96 (repeatedly stating prejudice inquiry in aggregate terms of reasonable probability counsel's <u>errors</u> affected outcome of the proceeding); see <u>Fisher</u> [v. Gibson 282 F.3d 1283, 1307-11 (10th Cir. 2002)] (assessing prejudice from counsel's "numerous shortcomings and omissions," and holding "these errors" had a devastating impact on the defense"); Turner v. Duncan, 158 F.3d 449, 457 (9th Cir. 1998)("it is appropriate to consider the cumulative impact of counsel's errors in assessing prejudice").

(Cargle v. Mullin 317 F.3d 1196 (10th Cir. 2003)(brackets from original removed, present brackets supplied, and emphasis for "errors" in original)).

This case started with presumptively prejudicial errors, and then was further infected by numerous errors by counsel. The question is thus presented: would the proceedings have turned out differently but for the errors in this case? The simple answer is yes.

First, Mr. Khan would have been able to actually prepare a defense to the allegation that he was a serial child molester had counsel not committed all their errors. This case has always been and will always remain a sentencing case. There was

virtually no probability that the case was ever going to see a trial. So, the prejudice with all the ineffectiveness is about sentencing. But for all the errors of his counsel, there is a reasonable probability that Mr. Khan would never have been charged with Attempted Production. There is a reasonable probability he would have entered a plea in the very early stages of the case. There is a reasonable probability the government would not have been able to employ a jailhouse snitch, that clearly lief for his own benefit, to manufacture evidence to enhance Mr. Khan's sentence, and there is a reasonable probability Mr. Khan would have received FAR less than the 20 year imprisonment with lifetime supervised release term that he received.

To be sure, Mr. Khan still maintains that he is legally innocent of the Attempted Production charge, and would have contested it in trial. But the reality of the matter is, that charge would never have come to light if defense counsel was constitutionally effective.

We also cannot forget that Mr. Khan suffered presumptively prejudicial interference and abandonment of counsel. These issues create an absolute mess of this case. Mr. Khan, Mr. Ward, Ms. Hollander, and Mr. Ellis valiantly tried to correct all these errors; but the United States and the Court were unwilling to deal with it at the time.

There is also the prejudice suffered at the eventual suppression hearing on the Fourth Amendment issue. Certainly, if Mr. Bowles and Mr. Gorence did their job from the beginning there would NEVER have been a suppression hearing. But they failed, and one occured. Had they actually investigated, there is a high probability that the evidence would have been suppressed. Not only did the Det. lie in her affidavit, the warrant identified NOTHING and its supporting documents were not "physically connected" as the Tenth Circuit held the Fourth Amendment **demands** (United States v. Leary 846 F.2d 592, 603 (10th Cir. 1988)).

5.      <strong>Conclusion to Section IV.B</strong>

There is no doubt that Mr. Khan was deprived his Sixth Amendment right to the effective and unobstructed right to counsel during critical stages of the trial process. He has shown counsel abandoned him that caused a deprivation of counsel of choice (Sec. B.2, supra.); that the government interfered with his right to counsel (Sec. B.3, supra.) and that there were intentional, and unjustifiable, intrusions into the attorney-client relationship (Id.). Mr. Khan has also shown that defense counsel was prejudicially deficient in their representation of this case. Consequently, Mr. Khan is entitled to relief on this ground.

### C.    Fifth Amendment

#### 1.   Introduction

This case was improperly handled by the prosecution from its inception. The United States has concealed its wrong-doing and has misled the Court regarding its handling of this case all along. In this section, Mr. Khan makes several claims of misconduct: (1) Suppression of Evidence, (2) Manufacturing Evidence, (3) Selective Prosecution, (4) Invading the Attorney-Client relationship, (5) Perjury, and (6) Intentionally bypassing Federal Rules and Law. Each of these issues will be discussed seriatim.

#### 2.  Prosecutorial Misconduct

The prosecuting attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, the prosecutor is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocent suffer., He may prosecute with earnestness and vigor -- indeed, he should do so. But **while he may strike hard blows, he is not at liberty to strike foul ones**. It

is as much his duty to refrain from
improper methods calculated to produce a
wrongful conviction as it is to use
every legitimate means to bring about a
just one. It is fair to say that the
average jury, in a greater or less
degree, has confidence that these
obligations, which so plainly rest upon
the prosecuting attorney, will be
faithfully observed. **Consequently,**
**improper suggestions, insinuations, and,**
**especially, assertions of personal**
**knowledge are apt to carry much weight**
**against the accused when they should**
**properly carry none**.

### a. Suppression of Evidence

The prosecution has a duty to turn over all "evidence favorable to an
accused...where the evidence is material either to guilt or punishment" (Brady v.
Maryland, 373 US 83, 87 (1963)). In order to establish a violation of Brady, three
elements must be present: "the evidence at issue must be favorable to the accused,
either because it is exculpatory, or because it is impeaching; that evidence must have
been suppressed by the [prosecution], either willfully or inadvertently; and prejudice
must have ensued" (Douglas v. Workman, 560 F.3d 1156, 1173 (10th Cir. 2009)). Prejudice
is found "when the suppressed evidence is material for Brady purposes" (Id.).
"Favorable evidence is material...if there is a reasonable probability that, had the
evidence been disclosed to the defense, the result of the proceeding would have been
different" (Id.; internal citation and quotations removed). Lastly, evidence that is
known to the police, but not the prosecutor is also subject to Brady analysis
(Youngblood v. West Virginia, 547 US 867, 869-70 (2006)). Thus, a prosecutor cannot
defend a Brady claim by blaming the police for not turning it over (Id.).

In this case, the prosecution suppressed several material and favorable
pieces of evidence. To begin, the prosecution suppressed two critical pieces of
information - and actually provided misinformation - regarding the fourth amendment

suppression issue.    Had the prosecution disclosed these, there is a reasonable probability that the suppression hearing would have fared better for the defense, the defense would have pursued a <u>Franks</u> and Rule 41 claim, and the prosecution would have been pressured into offering a substantially lower plea.    Mr. Sinha and Ms. Ong suppressed information about the Child Protection System that was vital to counsel's investigation.    Indeed, counsel specifically asked for information regarding the Child Protection System that was referenced in Detective Thatcher's affidavit [Doc. 21].    Mr. Sinha and Ms. Ong refused to turn anything regarding the system over citing that it was a GOVERNMENT owned law enforcement tool and the Government was under no obligation to disclose such information.    However, the Child Protection System is NOT a government owned or operated system.    The government merely utilizes the system - much like an end-user utilizes a Google E-Mail account.    Thus, Ms. Ong and Mr. Sinha misinformed the defense about this system and prevented Mr. Khan from impeaching Detective Thatcher at the hearing, raising a credible <u>Franks</u> claim, and offering to the Court that the system amounted merely to unreliable hearsay evidence and without any further investigation probable cause was lacking.

Next, Ms. Ong and Mr. Sinha deliberately misinformed the defense about who, in fact, was the case agent in charge of the investigation.    Indeed, it was Special Agent Legaretta and NOT Detective Thatcher.    The suppression of this information allowed Detective Thatcher to remain in the suppression hearing PRIOR to her own testimony under the "case agent exception".    Further, this information was vital to determining who to call as witnesses in the case.    The prosecution deliberately suppressed this information to hide their own deliberate bypassing of the Federal Rules of Criminal Procedure and Federal Law.    Again, this information would have been vital to impeaching Detective Thatcher as she continually testified that she was the case agent and in charge of everything at the search.    She wasn't, and in fact the number of federal agents outnumbered the number of local police.

With regard to exculpatory evidence regarding guilt, the prosecution did not turn over any evidence to demonstrate their investigation into identifying the end-user of "lovesgporn", the alleged victim of count four. The government still has not turned over any evidence of this investigation. It is plainly unreasonable to believe that the government believed this person was a minor who was being groomed online to produce child pornography and DIDN'T even try to go find him. Indeed, new defense counsel found evidence that this person was, all along, an adult - which was Mr. Khan's defense. Mr. Khan would have proceeded to trial had this evidence come to light BEFORE Mr. Khan's plea. And since Mr. Khan's plea was on the eve of trial, there is no evidence that Ms. Ong or Mr. Sinha were ever going to turn over this information.

Finally, the prosecution suppressed two witness interviews that were vital to the punishment determinations and their suppression resulted in an unfair case to Mr. Khan. Ms. Ong and Mr. Sinha suppressed an interview with Zech Ariah Massey, Mr. Khan's little brother with Big Brother's Big Sisters. The prosecution was operating under the theory that Mr. Khan was a "serial child molester" and wanted to connect the dots to such a conclusion. Early in their investigation they interviewed Mr. Massey over the telephone and found that Mr. Khan never did anything bad to him despite spending weekends with Mr. Khan since he was about 12 years old. The other was an interview of Matthew Morgan. The prosecution never turned over the tapes of this interview. Again, it was discovered that Mr. Khan had known Mr. Morgan since he was about 5 years old, and at the time of the interview he was about 12 years old. He had been around and alone with Mr. Khan several times, and Mr. Morgan confirmed that Mr. Khan never did anything to him.

The prosecution was hell bent on proving a five point guideline enhancement to max out Mr. Khan's advisory guideline for pattern of activity. Suppression of both of these interviews affected numerous decisions by defense counsel (into, for example, not advising Mr. Khan to plead without a plea agreement), and ate at the heart of the

government's claim that they had evidence Mr. Khan was a "serial child molester".

This information was also relevant to the guilt inquiry for Count four. The government intended to use 404 evidence to prove count four as there was no <u>direct</u> evidence the person Mr. Khan was speaking with was in fact a minor. Thus, the government intended to prove, through 404 evidence, that Mr. Khan "believed" the user of lovesgporn to be a minor.

All of this information was material to Mr. Khan and obviously favorable. Regardless if Ms. Ong and Mr. Sinha <u>intentionally</u> suppressed this information, a violation of due process has been credibly presented (<u>Brady</u>, supra.).

### b. Manufacturing Evidence

Probably the absolute worst conduct a prosecutor can engange in is manufacturing fake evidence to pad a case. There is, most like, nothing more reprehensible during a criminal prosecution. The prosecution in this case obviously couldn't have cared less about reprehensible conduct because they continually manufactured fake evidence to destroy Mr. Khan.

As Mr. Khan has stated numerous times, this case was an open and shut trafficking in child pornography case. Mr. Khan has consistently and openly admitted to his criminal conduct regarding that. This case became a battle on whether or not Mr. Khan was a child molester and that is where Mr. Khan drew the line. He has consistently and emphatically stated, in numerous settings, that he has **never** sexually, physically, psychologically, or emotionally abused any child. But those statements were not good enough for the prosecution, and they absolutely had to connect the dots. If anything, to save face with the public. It isn't any surprise that the prosecution team (ie. Detective Thatcher and Special Agent Legaretta) were very public about the capture and arrest of Mr. Khan and implied that there was evidence of him assaulting children actively. Most troubling is that following the initiation of the federal prosecution of Mr. Khan, Mr. Sinha was promoted to "Main Justice" and given a posh "trial attorney"

position with the Child Exploitation and Obscenity Section. Interestingly, the CEOS -which was not involved in the case from the beginning - became very involved after Mr. Sinha's promotion. While it is obviously merely speculation, it appears that Mr. Sinha, Detective Thatcher, and Special Agent Legaretta were put into a position to keep the notoriety of the case at an ever increasing peak.

The prosecution couldn't connect the dots that Mr. Khan was a "serial child molester" and indeed couldn't find any credible evidence that he ever molested any child. This was evident in the police reports. When police cannot make their theory, they apparently don't report their findings like a scientist, they employ snitches to make their dots for them. That is exactly what happened here.

Mr. Sinha and Ms. Ong claimed that they were concerned for initiaing interviews with Mr. Khan while he was in custody and apparently they consulted the Advisory Office of Profession Responsibility for guidance. The AOPR apparently informed them to utilize a "taint team". A taint team was created to employ the informant. However, Mr. Sinha was part of the initial briefing meetings with the informant to explain to him what information was needed. Obviously, the taint team was just a ruse. Mr. Sinha was not going to let his position go, and he didn't. Instead he created a sitution he knew would produce manufactured evidence. He told the informant exactly what information was needed and predicated a very generous offer on producing that exact information. Obviously, the informant wanted to get his deal. He was outfitted with a wire and was NOT able to secure the information as required for his deal.

What is he told after this? Just go back to the jail and take notes. There, the informant was able to take innocuous conversation and turn it into incriminating statements. The informant made numerous claims to law enforcement, and none of them were able to be corroborated.

Despite the obviousness of the lies the informant made, Mr. Sinha and Ms. Ong still insisted on presenting them as fact to the Court. Indeed, they listed in graphic

detail - and certainly insinuated they were credible claims - all of the claims made by the informant [Doc. ____ - Response to Doc. 22 under seal]. Sadly, the Court assumed these facts were true, at least for the purposes of the suppression hearing [Doc. 56].

If that weren't bad enough, false reports were made and utilized by the prosecution. Indeed, the prosecution asserted that Mr. Khan digitally penetrated WB. However, that is not what WB said, and the State of Arizona explicitly found that WB made no allegations of criminal wrong-doing by Mr. Khan. Evenso, the prosecution presented this as if it were fact. Then, the prosecution presented that AC - the alleged victim in the case filed in Arizona (State of Arizona v. Erik Khan, CR2015-000944-001), the prosecution conveniently ignored Mr. Khan's employment record and AC's claims did not coincide with each other.

Mr. Sinha and Ms. Ong obviously manufactured these false facts to acheive their desired result - a five point enhancement on the guidelines for pattern of activity (USSG 2G2.2(b)(6)). Mr. Sinha and Ms. Ong should be reprimanded by the heavy hand of the Court for this absolute injustice. Their actions made all the proceedings against Mr. Khan unfair and that violates due process (County of Sacramento v. Lewis, 523 US 833, 846 (1998)).

### c. Selective Prosecution

In his motion, Mr. Khan raises a claim of selective prosecution. Admittedly, this claim is undeveloped and will require discovery to further prove that there is a "federal prosecutorial policy [that] ha[s] a discriminatory effect and that it [is] motivated by a discriminatory purpose" (United States v. DeChristopher, 695 F.3d 1082, 1097 (10th Cir. 2012). Thus, Mr. Khan will file a Motion for Limited Discovery for this claim.

However, it must be noted that Mr. Khan has made a compelling case of selective prosecution. In his Motion to Withdraw his plea under Rule 11(d)(2)(B), Mr. Khan showed numerous statistics to show that Mr. Sinha and Ms. Ong had utilized the plea

negotiation process to selectively prosecute Mr. Khan [Doc. 91]. Mr. Khan argued that he was prevented from bringing the claim due to forces beyond his control and attempted to withdraw from his plea, inter alia, to litigate the issue. Obviously, the Court denied the motions to withdraw the plea [Doc. 110]. Thus the issue still has not been litigated.

In his original motion to withdraw under Rule 11(d)(2)(B), Mr. Khan offered a theory that the prosecution went after Mr. Khan far more aggressively than other similarly situated defendants because of his heritage (ie. Asia/Pakistani).

Since then, Mr. Khan has discovered another interesting point. The defendants that were similarly situated to Mr. Khan, received far lower sentences, and arguably more favorable plea agreements from Ms. Ong and Mr. Sinha when the victims in the case were female. Mr. Khan's case presents an interesting point - and is evident to all other similar cases. When the victims are boys (or the same sex as the defendant), the defendant is charged more harshly and receive higher sentences than those defendants who have victimized girls. This is true with regard to contact offenses and child pornography offenses. It is unreasonable that the government is treating homosexual defendants to more prison time than heterosexual defendants.

Surely, the government couldn't possibly believe that somehow boys are more damaged than girls after such abuses are committed upon them. We certainly hope the government is not discriminating female victims from justice and their day in Court either.

It is a sad reality, but the prejudices that exist towards homosexuals in America is quite apparent. Despite numerous civil rights fights that have occurred on our nation's streets and courts, it is only recently that the Supreme Court extended the right of homosexual couples of joining in civil marriage under the Equal Protection Clause (Obergefell v. Hodges, 192 L.Ed.2d 609, 629-630 (2015)). "Indeed, in interpreting the Equal Protection Clause, the Court has recognized that new insights and societal

understandings can reveal unjustified inequality within out most fundamental institutions that once passed unnoticed and unchallenged" (Id. at 630).

Thus, it is obvious that unjustified inequality has pervaded the criminal courts; at least in this type of case. Take the case of United States v. Noah Carney, which is also a District of New Mexico case. Ms.Ong allowed Mr. Carney to plead to a single count of Enticement of a Minor in violation of 18 USC 2422(a) despite him commiting virtually the same attempted production crime that Mr. Khan allegedy committed. Mr. Carney was engaged with a known child and attempted, on several occassions, to get photographs created by the minor girl and messaged to him through cell phone networks. Mr. Carney is not only white and Christian, he is obviously heterosexual. At first blush of the statute, one could argue that Mr. Carney didn't get a better deal because his potential maximum was LIFE. However, despite the crime being considered worse than production offenses, at least in looking at maximum punishments, Mr. Carney was given a stipulated Rule 11(c)(1)(C) plea for the Mandatory Minimum of ten (10) years incarceration - 10 years LESS than Mr. Khan.

We aren't finished. Mr. Carney is also a repeat sex offender having molested his foster sister as an older teenager in Arizona. Mr. Carney was adjudicated delinquent as a juvenile, and went to a treatment program in Arizona. Within MONTHS of his release from Arizona's custody, Mr. Carney committed the offenses he was charged with. One could only ask how he received such wonderful treatment from Ms. Ong, when Mr. Khan did not?

There are other cases that show the same type of decision making going on at the United States Attorney's Office in the District of New Mexico.

Either way, Mr. Khan has made a prima facie case of selective prosecution and should be permitted to pursue the claim further. As such, Mr. Khan will submit a Motion to that effect.

As a final note, Mr. Khan would like to incorporate the argument that his

post-plea counsel raised with regard to selective prosecution and incorporate all the statistical and local evidence of selective prosecution. This, added with the above argument about discrimination on gender and sexuality, should be read in tandem and considered together.

### d. Intruding into the Attorney-Client Relationship

Another issue the Court is aware of is that Mr. Khan was informed post-plea that the United States intercepted numerous attorney-client phone calls from Mr. Khan while he was at DACDC. As discussed before, DACDC created a situation that forced Mr. Khan to use 'the phones at DACDC that were apparently recorded without his knowledge or consent (see Sec. IV.B.3, supra.). Of utmost concern was the fact that Mr. Sinha and Ms. Ong had possession of these calls and hid this fact from the defense and the Court. Indeed, Ms. Ong and Mr. Sinha - in responding to the motions to withdraw - attempted to assert that only the taint team had access to such calls. However, Mr. Khan submitted a letter received from the United States Attorney's Office that showed Ms. Ong and Mr. Sinha indeed had copies of attorney-client phone calls in their case file and had failed to turn them over.

The attorney-client privilege. It is well known that confidential communications between attorney and client "is the oldest of privileges for confidential communications known to the common law....Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice" (United States v. Ary, 518 F.3d 775, 782 (10th Cir. 2008) quoting Upjohn Co. v. United States, 449 US 383, 389 (1981)).

Phone calls between an attorney and client is analogous to the "work product doctrine" which is similar to the privilege. Obviously, an attorney and client must eventually speak with each other, and this will affect work-product to come out. The

holder of the privilege must jealously guard it from disclosure (Upjohn, supra.) but what of intentional intrusions unknown to the holder of the privilege?

In <u>Ary</u> the Tenth Circuit reviewed the work-product doctrine and treated the seizure of documents created under that doctrine the same as the privilege (Ary 518 F.3d at 783). In that case, the Court found that the privilege holder must expeditiously assert his privilege to the information when it is seized.

This is a whole different matter. Mr. Sinha and Ms. Ong CONCEALED the fact they and/or members of their team were actively listening to attorney-client phone calls and it was obvious Mr. Khan had no idea. Did they just listen to one or two or three calls and let counsel know? No they didn't. They seized every single attorney client phone call made at DACDC and had an Agent that was NOT on the taint team listen to each and every one of them. Then, Mr. Sinha and Ms. Ong placed the discs with the calls in their own file on Mr. Khan that they obviously had carte blanche access to. This conduct is reprehensible and Mr. Khan deserves relief.

At this point, an implicit standard has been set that it is ok for the United States Attorney's Office for the District of New Mexico can violate the oldest of privileges to confidential communications.

Once Mr. Khan was notified of this problem, he fired his counsel and hired new counsel. After allowing the new counsel a reasonable opportunity to investigate the voluminous errors in this case, Mr. Khan decided to attempt to withdraw his plea. The goal was, inter alia, to pursue this misconduct within the trial process under a motion to dismiss. Mr. Khan was, obviously, not permitted this opportunity after his discovery of the conduct of the government and is forced to raise it here.

### e. Mr. Sinha committed perjury

Mr. Sinha obviously loves the seat of power he has been granted and feels constrained by no amount of ethics. He started this case with lies, and continued to do the same throughout.

Mr. Khan was once told by Mr. Ward that credibility is everything to the Court. It is never good for a lawyer to misrepresent facts or lie to the Court. Sadly, Mr. Khan's experience has been that the prosecutor can pretty much do anything they want with impunity.

In the United States Marine Corps, integrity is everything. Mr. Khan is many things, but a liar is not one of them. But, Mr. Sinha continually presented Mr. Khan as one.

In the very beginning of this case, Mr. Sinha received, through his own misconduct, an extra 21 days to investigate his detention case against Mr. Khan (Sec. IV.B.2, supra.). Mr. Sinha utilized this time to gather some information about Mr. Khan and not finding the slam dunk that he was looking for, just lied in his affidavit. Mr. Sinha presented, for instance, that Mr. Khan had an active pilot's license and could thus, literally, fly away. Mr. Sinha is a lawyer and Mr. Khan certainly hopes that law school instructed on how to read the law. There is a major difference in the law between an Airman's Certificate and a Student Medical Certificate (cf. 14 CFR 67.301, et seq. and 14 CFR 61.1, et seq.). Mr. Sinha could easily determine that all Mr. Khan had was a THIRD CLASS MEDICAL CLEARANCE, that's it. He did not have an active pilot's license under Part 61 of Title 14 of the Code of Federal Regulations. Mr. Sinha intentionally lied to bolster his case.

In his affidavit for detention, Mr. Sinha also presented that he had located evidence that Mr. Khan was actively grooming multiple children for production of child pornography. This was also patently false. Mr. Sinha and his team located a couple of chat logs that did NOT discuss the ages of either party, and there was no direct evidence that the other party was a minor.

Mr. Sinha had no problem lying to this Court, and kept doing it. This is yet another example of the government's policy of winning over pursuing justice. Justice has been denied through Mr. Sinha's actions.

### f. Bypassing the Federal Rules

Mr. Sinha has been involved in this case since before Mr. Khan was arrested. He was in constant communication with Special Agent Legaretta and had given the green light to pursue a prosecution. How is it then that Mr. Khan was placed into State custody first and then moved to the federal Court a couple of weeks later? We know this happened, and it should not have. As argued in Section IV.B.2 (at pp. 7-8), Mr. Khan presented his arguments for intentionally bypassing the federal rules. And it is clear that is what happened here. Mr. Sinha always intended to prosecute this case and thus had a duty to comply with the Federal Rules of Criminal Procedure. He and Special Agent Legaretta obviously bypassed the rules and gained a tactical advantage in the detention case of Mr. Khan (Id.).

### g. Protective Orders

The Court already knows that it issued protective orders that went unopposed by the defense. While Mr. Khan argues that the expansive orders were the product of ineffective assisantce of counsel (Sec. IV.B.4.d.vi, supra.). The fact that the prosecution asked for a much more reasonable order in the motion and then submitted a proposed order that went way too far is also prosecutorial misconduct. Inasmuch as this deprived Mr. Khan the due process right to prepare his defense and be a part of his own defense, he presses it here.

### 3. Conclusion to Section IV.C

Prosecutors have a serious amount of power in our Country. They have the power to decide who will be prosecuted and for what. They are generally the ones that decide how much time a person will receive since statutory sentences are exceedingly high and virtually all defendants feel the risk is not worth those ridiculous sentences. Thus, the defendants engage in plea bargaining.

In this case, the prosecution just plainly went too far. Manufacturing evidence has got to be the worst of the worst crimes a prosecutor can commit; and they

deserve to be punished for their misconduct.

Sadly, prosecutors will only learn to abide by ethical constraints when that punishment can be felt. The only way that will happen is if this Court sets aside Mr. Khan's convictions in full and orders his immediate release.

However, Mr. Khan is not delusional, and has always said that he has always been willing to accept responsibility for his actual conduct. Thus, Mr. Khan proposes that the Court set aside the conviction for the attempted production count, and order a fresh PSR with a fresh sentencing hearing with new prosecutors for Mr. Khan. This would tease out the errors of the prosecutors in this case.

Mr. Khan is a believer in justice, and he meant what he said to the Court through his sentencing video. People have been harmed by the production and dissemination of child pornography and there is definitely a valid reason to pursue these prosecutions. However, there is never a valid reason for the government to use their power to just hammer someone beyond all recognition. It isn't right and some form of relief from these errors is warranted.

Finally, Mr. Khan asks the Court to refer this case to be reviewed by the Disciplinary Panel for the Federal Bar for the District.

### D.        Jurisdiction

#### 1.  Introduction

In this section, Mr. Khan brings two facial challenges to the statutes of conviction. First, Mr. Khan will press a vaguess challenge and then a substantial overbreadth challenge as the definition of sexually explicit conduct utilizes the word "simulated" to proscribe expressive media from the population.

These arguments should not be read as some justification for the harm caused to children through the creation, dissemination, and possession of visual media that harmed children during its creation. That should most definitely be prohibited. Indeed, our Bill of Rights does not predicate one man's right to speak by reducing the autonomy

of another. Abuses of the right of the freedom of speech deserve Congressional proscription, and there is no argument that the framer's ever intended to allow persons to be harmed just to allow others to speak freely.

However, to simulate harm should not be proscribable. Indeed, as will be discussed, there are numerous examples already in circulation, of visual artistic works that simulate the various abuses of children. These artistic works fall under the purview of the proscription on visual depictions of "sexually explicit conduct".

Obviously, if a law does not comply with the Constitution's various guarantees, there is no way a Court could have jurisidiction to hear the case. Indeed, the law was never passed, as Congress lacks the power to just rid the nation of constitutional protections without a proper convention.

Inasmuch as this issue wasn't raised prior to Mr. Khan's initial plea, that wasn't for lack of want. Mr. Khan asked Mr. Gorence and Mr. Bowles to raise the issue of constitutionality, but informed Mr. Khan there were no credible challenges. After years of reasearch and learning about First and Fifth Amendment jurisprudence, Mr. Khan believes he has stumbled upon a valid constitutional argument and if victorious in his argument could not be held accountable under these statutes.

### 2. Fifth Amendment

### a. Legal Standards for Vagueness Claims

"The void-for-vagueness doctrine derives from the Due Process Clause of the Fifth Amendment, which guarantees that 'no person shall...be deprived life, liberty, or property, without due process of law.'" (Golicov v. Lynch 837 F.3d 1065, 1069 (10th Cir. 2016)). A criminal law is vague when it "tak[es] away someone's life, liberty, or property...that [] fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.

When a litigant makes a facial vagueness challenge, the Court "must begin

with the presumption that the statute comports with the requirements of federal due process and must be upheld unless satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution" (United States v. Hunter, 663 F.3d 1136, 1141 (10th Cir. 2011)). Recently, the Supreme Court struck down the so-called "residual clause" of the Armed Career Criminal Act for vagueness. There, the Court reminded that "[t]he prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law, and a statute that flouts it violates the first essential of due process" (Johnson v. United States, 135 S.Ct. 2551, 2557 (2014)).

### b. The Statute

Mr. Khan is challenging the entirety of Chapter 110A of the Title 18 in that the definition for "sexually explicit conduct" is void-for-vagueness." All proscriptions that Congress has named are effected by the definition for "sexually explicit conduct" and the problem is not severable.

For the purposes of the Act and this argument, "sexually explicit conduct"is defined as:

> (2)(A) Except as provided in subparagraph (B), "sexually explicit conduct" means actual or **SIMULATED**--
>
>> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
>> (ii) bestiality;
>> (iii) masturbation;
>> (iv) sadistic or masochistic abuse; or
>> (v) lascivious exhibition of the genitals or pubic area of any person;
>
> (B) For purposes of subsection 8(B) of this section, "sexually explicit conduct" means--
>
>> (i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious **simulated** sexual intercourse

where the genitals, breast, or pubic area
of any person is exhibited;
(ii) graphic of **SIMULATED**;
   (I) bestiality;
   (II) masturbation; or
   (III) sadistic or masochistic abuse; or
(iii) graphic or **SIMULATED** lascivious
exhibition of the genitals or pubic area of
any person.

(18 USC 2256(2) (emphasis added)(LEXIS 2017)).

### c. The definition is vague

Congress, by utilizing the word "simulated", has created a law that causes men of ordinary intelligence to not know what is prohibited. Does Congress really believe that "simulated" is a definite word that men of ordinary intelligence would be able to determine the conduct prohibited? Obviously, they do.

What are people not to do? Are they ever allowed to create a visual depiction of the abuse they suffered through the abuse they had suffered in their own lives? Are they never allowed to create a movie showing their own coming of age and discovery of sexual identity.

Any reasonable person would be worried and refrain from taking a pulitzer prize winning book and converting it to a movie such as Angela's Ashes by Frank McCourt. Is there any wonder why this has never been adapted into a movie? Obviously, the movie production would have to "simulate[]" the sadistic abuses and sexual discovery of the boy in the true story. There was nothing that is morally repugnant by Mr. McCourt's recounting of his childhood. Would simulating these scenes violate the definition of sexually explicit conduct? One would certainly hope that a movie company wouldn't actually abuse children (or anyone for that matter) to make their point. The issue here has nothing to do with the definition for the actual abuses the statute proscribes. It's the simulated abuses.

### 3. First Amendment

Whatever isn't vague about "simulated" conduct is overbroad. Here, Mr. Khan makes a substantial overbreadth challenge to the same definition utilizing the word

simulated.

### a. Legal Standards for Overbreadth Claims

A criminal defendant is permitted to challenge, under the First Amendment, a statute as overbroad - and thus unenforceable in toto - even where their conduct may be legitimately proscribed (New York v. Ferber, 458 US 747, 768 (1982)). The Supreme Court has established, that for a challenger to prevail on a First Amendment facial challenge, they must show that there is "substantial overbreadth" (Id. at 769-70).

The practical application of this is that Mr. Khan must show that there is a "realistic danger that the statute...will significantly compromise recognized First Amendment protections" (Members of City Council v. Taxpayers of Vincent, 466 US 789, 801 (1984)). To do this, Mr. Khan "must identify protected materials that would be inevitably targeted by the [challenged] statute" (United States v. Brune, 767 F.3d 1009, 1020 (10th Cir. 2014)). The touchstone to a facial attack on First Amendment grounds is that the overbreadth must have substantial real-world applications and not mere "fanciful hypotheticals" (United States v. Stevens 176 L.Ed.2d 435,454 (2010)).

Child pornography has been long held to not be protected by the First Amendment. However, "[t]he broad authority to proscribe child pornography is not [] unlimited" (Williams, supra at 660). The Supreme Court made very clear that the crime to prohibited is not in the cravings, thoughts or desires of the pornographers, but of the harm to actual children (Ashcroft v. Free Speech Coalition, 535 US 234, 240 (2002)). Indeed, every holding to publish from the Court has stressed that the prohibition on child pornography has to do with the protection of the health, well-being, and maturation of actual children (Ferber, supra; Osborne v. Ohio 495 US 103, 111 (1990)("The pornography's continued existence causes the **child victims continuing harm by haunting the children in years to come**")(emhasis added)).

The Child Porngraphy Prevention Act ("CPPA") has suffered several attacks for overbreadth. Most recently, the Court invalidated two provisions of the Act as

overbroad as they proscribed the creation and dissemination of images involving fictitious minors - as oppossed to real minors. Thus, the Circuits have extended this reasoning to criminal cases as a requirement that the government prove, beyond a reasonable doubt, that a real child was used in the creation of the depiction at issue (United States v. Sims, 428 F.3d 945, 956 (10th Cir. 2005)).

We must remember that Congress' authority to proscribe child pornography does **not** "consist in the cravings of the person posing the child or in the cravings of his audience" (United States v. Hernandez 183 F.Supp.2d 468, 471 (D.P.R. 2002)). The crime that Congress is permitted to proscribe, under the First Amendment, is "the offense against the child -- the harm to the physiological, emotional, and mental health of the child" (Id. quoting Ferber, supra). Be that as it may, "we must bear in mind that at the bottom of every child pornography case, lie the conflicting interests of free expression and a child's own particular autonomy and dignity" (Id.).

### b. The CPPA is Facially Overbroad

The CPPA is codified at 18 USC 2251, et seq. and hold statutory definitions at 18 USC 2256. Notably, the CPPA prohibits the creation and/or dissemination of visual depictions that portray actual children engaged in "sexually explicit conduct". However, "sexually explicit conduct" is not the typical definition as we would naturally think. Indeed, the definition for "sexually explicit conduct" in the CPPA is different than for "sexual act" as defined for the sexual abuse statutes (18 USC 2246(2)(note that "sexual act" and "sexual contact" does not prohibit simulations of the same)). In Free Speech Coalition the Supreme Court found and held that "the Government can prohibit non-obscene child pornography **only to achieve the State's interest in protecting children exploited in the production process**" (Sims, supra). Consequently, the Supreme Court made clear that Congress cannot proscribe depictions that "appear" to use minors. The production of the depictions must use real minor in their production to violate the CPPA (Id.).

Here, Mr. Khan is attacking use of the word "simulated" in the CPPA's definition of sexually explicit conduct (18 USC 2256(2)). Just like the issue in Free Speech Coalition, use of the word simulated extends the Act to visual depictions that do not harm children during the production process and certainly do not "haunt children in the years to come" (Ferber, supra). Mr. Khan presents that real children can, and are, used to produce visual media that simulates sexually explicit conduct - as defined in the CPPA - to create artistic and socially acceptable works of art that are protected by the First Amendment. Thus, the CPPA is facially overbroad and unconstitutional.

### 1. Step One

Naturally, "the first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers" (Williams, supra, 553 US at 293).

In the world of statutory construction, when Congress leaves a term undefined in an Act, the Court is to give the questioned term its "ordinary, contemporary meaning at the time Congress enacted the statute" (Brune, supra, 767 F.3d at 1022)). It is permissable to "consult a dictionary to determine the plain meaning of a term" (Fish v. Kobach, 840 F.3d 710, 733 (10th Cir. 2016)).

According to Webster's II New Riverside University Dictionary (Houghton Mifflin Co., 1994), "simulate" is defined as:

> sim·u·late [] vt. -lat·ed, -lat·ing, -lates
> 1.  To have or take on the appearance, form, or
>     sound of: IMITATE.
> 2.   To make a pretense of: FEIGN <simulate an
>     interest in a coversation>
> --adj. [] Simulated.

(Webster's II New Riverside University Dictionary at 1086). Thus, "simulate" means, in layman terms, to appear to be the real thing. (Cf. Free Speech Coalition, supra (holding "appears to be" to be overbroad in context of minority status of actors).

A citizen (and sometimes a foreign national) commits crimes involving child pornography if an image merely uses a real minor child appearing to have sexual

intercourse, bestiality, masturbation, or lascivious exhibition (18 USC 2256(2)). Thus, a real child does not need to actually perform these acts. He need only simulate the acts and, thus, not be abused. Indeed, a child could conceivably video or photograph himself "simulating" mastubation as a joke. Indeed, with the current state of technology, we know this is actually happening all over the country. Indeed, the Supreme Court recognized that sometimes children do engage in "sexually explicit conduct" at their own volition (Free Speech Coalition, 535 US at 247 ("It is, of course, undeniable that some youths engage in sexual activity before the legal age, either on their own inclination or because they are victims of sexual abuse."))

We know that the CPPA has no exception for serious artistic or literary works (Cf. Camfield v. City of Oklahoma City, 248 F.3d 1214, 1222 (10th Cir. 2001)(affirming District Court's judgement that State of Oklahoma has an exception for bona fide works of art that do not appeal to prurient interests and thus "The Tin Drum" was not considered child pornography under Oklahoma law). A simple reading of the CPPA makes it very clear, regardless of the overall theme of a visual depiction, if it has a real minor depicted in "actual or simulated" sexual conduct then the entire depiction is proscribed under the Act (Brune, 767 F.3d at 1026 n. 7).

The Act also does not require the presence of any nudity (United States v. Helton, 302 Fed. Appx. 842, 846-47 (10th Cir. 2008)(unpublished)("The statute does not specify the genitals or pubic area must be fully or partially uncovered in order to constitute an exhibition...")). Indeed, Courts have explicitly held that nudity is not necessary to show lascivious exhibition of the genitals (United States v. Kearn, 2015 US Dist. LEXIS 82488 citing United States v. Knox 32 F.3d 733, 745-46 (3d Cir. 1994); United States v. Helton, 302 Fed. Appx. 842, 846-47 (10th Cir. 2008)(agreeing with Knox).

Additionally, the CPPA prohibits real children engaged in simulating themselves, or at the behest of anyone else, in simulated conduct that isn't necessarily sexual in nature.

Indeed, the Act prohibits the simulation of "sadistic or masochistic abuse" (18 USC 2256(2)(A)(iv), (B)(ii)(III)). The "ordinary, contemporary meaning" (Brune, supra) of "sadistic" is:

> sa·dism [] n. [After Comte Donation de Sade (1740-1814).]
> 1. Delight in cruelty.
> 2. Extreme cruelty
> -sa'dist n. -sa·dis'tic adj. -sa·dis'ti·cal·ly adv

(Webster's II New Riverside University Dictionary at 1030). The "ordinary, contemporary meaning" (Brune, supra) of masochistic is:

> mas·o·chism [] n. [After Leopold von Sacher-Masoch (1836-1895), Austrian novelist.]
> 1. a. Deprivation of pleasure from being offended, dominated, or mistreated.
>    b. The tendency to see such mistreatment.
> 2. Direction of destructive tendency inward or upon oneself.
> -mas'o·chist n. -mas'o·chis'tic adj. -mas'o·chis'ti·cal·ly adv.

(Webster's II New Riverside University Dictionary at 730). Thus, there does not need to be the presence of any actual sexual conduct as one would expect in a pornography statute.

These definitions create serious problems, under the First Amendment, for the CPPA. Thus, the CPPA is unconstitutionally overbroad and must fall.

## 2. Real-world Applications

Mr. Khan has located a number of artistic works that fall victim to the CPPA's overbroad definition. Mr. Khan will provide a brief synopsis and helpful statistics for each work. He will also provide an explanation of how the First Amendment protected work violates the CPPA and the grasp the CPPA could have over its producers, distributors, receivers, and possessors.

### i. The Kite Runner

-Synopsis

The Kite Runner is a film adaptation of the book of the same title by Khaled Housseni. The story captivates the audience as the struggles of a young Amir whose only friend is the servant boy at his Afghanistan home named Hassan. The story profiles Amir's struggles to fit in and be accepted by his father.

The young Amir is a blessed kite flyer. His best friend Hassan is the most spectacular kite runner. In Afghanistan and Pakistan, kite flying involves a battle of kites. Each kite must cut the other, and the last one standing wins. The trophy is to run down the cut kite.

Amir has won and Hassan - the ever loyal best friend - promises to run and catch the kite as Amir's trophy to display. Hassan is able to locate the kite and catches it. However, he is in an alleyway at the bazaar and becomes trapped by his and Amir's nemesis Assef and Assef's gang. Because Hassan is a lesser individual in Assef's eyes, and Hassan had previously embarrassed Assef, Hassan had to be taught a "lesson" in manners. Assef gives Hassan a choice, give over the kite trophy or suffer far worse consequences.

The scene unfolds as Hassan informs Assef that he will not give up the kite under any circumstance. At that time, Amir finds Hassan and sees that Assef and his gang are surrounding Hassan. Amir, a scared 12-year-old boy, decides to hide and just watch. Assef proceeds to rape Hassan because he would not turn over the kite trophy. Amir watches the entire scene.

The scene is quite graphic. There is no doubt that it appears Assef is raping Hassan. The camera shows the actors engaged in simulated anal sex.

This scene could hardly be said to appeal to any prurient interest as it was the pivotal point of the movie. Amir is absolutely ashamed with himself and does not know how to handle that shame of not stepping in and stopping the rape. He decides the best thing to do is to cease being Hassan's friend. Then Afghanistan sufferes the

Russian occupation and the story turns to Amir's travels - with his father - to the United States. Amir discovers that his father had kept a fairly big secret that involved Hassan. This secret drives Amir to run back to Afghanistan to save Hassan's son from the fate of millions in Afghanistan - death and abuse by the Taliban. (The Court will have to watch the movie or read the book to discover the secret as it is quite interesting).

This movie has a scene that shows the sadistic sexual abuse of a prepubescent boy on the streets of Afghanistan and is thus a real-world example of a movie that violates the CPPA.

-Statistics

The Kite Runner was directed by Marc Foster and publically released on January 11, 2008. Amir was played by a youth actor named Zekeria Ebrahimi and was born in 1996. Thus, Amir was 12 years old at the time the movie was released, and was likely younger during its filming.

Hassan was played by a youth actor named Ahmad Khan Mahmoodzada and was born in 1997. Thus, Hassan was 11 years old at the time the movie was release and was likely younger during its filming.

Assef was played by Elham Ehsas, and his date of birth was not reported. However, it is fairly obvious in the movie that Assef is played by an actor that is clearly a minor.

The Kite Runner was rated PG-13 by the Movie Picture Rating Association. Additionally, the film employed 64 credited cast members, countless extras, and a large film crew to produce the movie. Finally, the movie was produced by Participant Productions and Sidney Kimmel Entertainment on a budget of $20M. The film grossed $110M $73.2M worldwide and over $15½M in the United States. (Source of information- imdb.com 2017).

-The Kite Runner violates the CPPA

This film clearly violates the CPPA. The "rape scene" of Hassan by Assef clearly and unequivocally simulates genital to anal contact between Ahmad Khan Mahmoodzada and Elham Ehsas.

Were we to prosecute anyone for the production of this film, we would have to prove beyond a reasonable doubt that: (1) Ahmad Khan Mahmoodzada was under the age of eighteen, (2) that the defendant used, employed, persuaded, induced, enticed, or coerced Ahmad Khan Mahmoodzada to take part in "sexually explicit conduct" for the purpose of producing or transmitting a visual depiction of that conduct (see 3-62 Modern Federal Jury Instructions -- Criminal, ¶62.01 (Matthew Bender)).

In order for us to prove that anyone disseminated and/or possessed this film, we would have to prove beyond a reasonable doubt that: (1) the Defendant knowingly transported, shipped, distributed, received, sold, possessed with intent to sell, possessed, or knowingly accessed The Kite Runner, (2) The Kite Runner was transported in or affecting interstate or foreign commerce or The Kite Runner was produced using materials that had been transported in or affecting interstate or foreign commerce, (3) The Kite Runner involved the use of a minor engaging in sexually explicit conduct and portrays that minor engaged in that conduct, (4) the Defendant knew that The Kite Runner involved the use of a minor engaging in sexually explicit conduct, and portrayed a minor engaged in that conduct, and (5) The Kite Runner involved a minor who had not reached the age of puberty or was less than 12 years old (Id. at ¶62.02).

Proving this case would be fairly easy. First, it is a known fact that Ahmad Khan Mahmoodzada was born in 1997 and was thus only 11 years old at the time of the movie's release in theathers. There is at least one scene where Ahmad Khan Mahmoodzada appears to be forcibly raped by another boy while being held down. Thus, the Act has two definitions that apply to this sexually explicit conduct: (1) simulated sexual intercourse (genital-anal) (18 USC 2256(2)(A)(i)) and (2) sadistic abuse (18 USC 2256(2)(A)(v)).

Each and every person involved with making this movie could easily be charged, and likely convicted, of conspiring to produce and/or producing a visual depiction utilizing a minor engaged in sexually explicit conduct and suffer a 15-year mandatory minimum sentence. Oddly, Mr. Ehsas, who played Assef, could not possibly be charged with the actual rape as a simulation is not a crime. An odd proposition indeed.

Each and every company that has distributed the film (ie. Blockbuster, Hollywood Video, Amazon.com, Netflix.com, etc) and their employees could be easily charged with an likely convicted of distributing The Kite Runner and face 5-20 years in federal prison. To top it all off, each and every person that possessed this hit movie or accessed it, with the intent to (oddly) view it, is facing up to 20 years in prison as Ahmad Khan Mahmoodzada was clearly under the age of 12 years at the time the film was made.

Hypothetically, were we to issue indictments to the entire film cast, director, and producers of this film, the United States could hand out hundreds of years in prison for making a hit movie. Millions of Americans could conceivably be locked in the Bureau of Prisons for decades to come because of merely purshasing this film (see: Reno v. ACLU, 521 US 874, 871-72 (1997)(noting that a criminal penalty of 2 years in prison is significant "may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images")).

Looking to the United States Sentencing guidelines, we find that the recommended penalty is astronomical in either case. For the, at least, 64 producers of this movie (ie. the Cast), 2G2.1 is the operative guideline. The total offense level would be: 32 (base) + 4 (minor under 12) + 2 (distribution) + 4 (depictions of violence + 2 (supervisory control) + 2 (use of a computer) = 46. Were any of these people to take the case to trial, and likely lose, they would receive a guideline recommendation of LIFE. Were they to plead guilty and receive an acceptance of responsibility award for 3 points (3E1.1), they would still face a recommendation of LIFE. Were they only

charged with a single count of production, they would receive a recommendation of 30 years. This is frankly absurd.

For the receivers, distributors, and possessors, their guideline would not fare so well either. For them, the operative guideline is 2G2.2. For the sake of argument, we will move forward with the base offense level in this hypothetical as a 22; given the vast majority of those sentenced under 2G2.2 will face such a base offense level. Thus, for the simple "traffickers" of The Kite Runner, the total offense level calculates to: 22 (base) + 2 (prepubescent minor) + 2 (simple distribution) + 4 (sadistic abuse) + 2 (use of a computer) + 2 (10-150 images (75 images for one video)) = 34 (151-181). Of course, for distributors like Amazona or Netflix, they would be subjected to even higher scores as distribution for pecuniary gain is enhanced at least 3 more offense levels (2G2.2(b)(3)(A)) and could conceivably be higher (Id. referencing 2B1.1 (given the movie made $73.2M, an easy assumption could be made that source distributors each made over $550K and thus would increase by 14 levels)). These numbers are indeed astronomical and the Untied States could conceivably lock up extremely large numbers of American people for breaking this law.

It is of no consequence that the government has not chosen to prosecute anyone for the creation, dissemination or possession of The Kite Runner. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige" (Stevens, supra 176 L.Ed.2d at 451). The Supreme Court has made abundantly clear that an unconstitutionally overbroad statute will "not be [upheld]...merely because the Government promised to use it responsibly" (Id.). The government's restrain has only prevented one thing; severe and rapid backlash from the film production community (cf. Free Speech Coalition, supra (action brought by film makers once they determined the CPPA affected their permissable activities).

There can be no claim that The Kite Runner is not protected by the First Amendment. It is a work of serious artistic quality and employed actors of critical

acclaim. The film presented numerous political and social issues that are present in the world today. The CPPA prohibits everyone in this country from owning, selling, accessing, or viewing this amazing movie. (*It must be noted that Mr. Khan is not asking for the United States to start indicting everyone over this movie either. It simply serves the point that real minors were utilized to produce a movie that contained at least one scene of "Sexually Explicit Conduct" and it is defined in the act.).

### ii. The Prince of Tides

-Synopsis

The Prince of Tides is a film that involves a man who is suffering with, what would today be called, post traumatic stress disorder. Tom Wingo is brought to New York to visit with his sister's psychiatrist after another suicide attempt. Mr. Wingo's sister is suffering from a rape she suffered during a home invasion when she was 13 years old.

Throughout the movie, Tom Wingo starts to befriend the psychiatrist and agreed to privately coach her son in football. The movie unfolds as Mr. Wingo begins to face his own demons; demons that extend from the same home invasion that plagues his sister.

During a "session" which Mr. Wingo has a breakthrough, he describes the home invasion that caused the rape of his sister and mother. While he is telling the story, the camera pans to the past and shows several men invade his home, and take his sister and mother into back rooms to rape them. However, Mr. Wingo struggles with the reality that he was also victimized during the home invasion.

Tom Wingo then tells the story that he too was raped by a man during that invasion; he was 10 years old at the time. While he is telling the story, the camera pans to the past again, and shows Tom Wingo's jeans being cut off with a knife and a man raping him.

The scene is artfully done and draws on the emotions of the viewer that boys

can in fact be victims of horrific rapes, and such abuse can haunt a boy for many years - just like a woman.

This scene is the "breakthrough" for Tom Wingo and an absolutely necessary piece to the story. The abuse suffered by little Tom Wingo was horrific, sadistic, and sad. Anyone with the most frigid of hearts would cry watching this scene.

### -Statistics

The Prince of Tides stars high ranking actors Nick Nolte and Barbara Streisand. Barbara Streisand directed the film, it was released on Christmas day in 1991. The movie grossed $110M worldwide and over $74½M in the United States. The movie was produced by Columbia Pictures Corporation with Barwood Films and Longfellow Pictures. The film was shot in the Charleston, S.C. and New York City areas.

Tom Wingo was played by Nick Nolte, Trey Yearwood, and Bobby Fain - depending on the scene. With regard to the "rape scene" that is shown and at issue here, the actor was Bobby Fain, who was 11 years old at the time of the movie's release to the public.

The Prince of Tides was nominated for 7 Oscar Awards and is still a very popular drama in circulation today.

### -The Prince of Tides violates the CPPA

This film clearly violates the CPPA. The "rape scene" of Tom Wingo by a home intruder clearly and unequivocally simulates genital to anal contact between the adult intruder and the prepubescent actor Bobby Fain.

Just like The Kite Runner were we to prosecute anyone for the production of this movie, the guideline would be astronmical (maybe we should let Nick Nolte and Barbara Streisand know there is no statute of limitations for this). Again, it would be rather easy to prove, beyond a reasonable doubt, that: (1) Bobby Fain was under the age of eighteen years, (2) and a defendant (say Ms. Streisand) used, employed, persuaded, induced, enticed, or coerced Bobby Fain to take part in "sexually explicit conduct" for

the purpose of producing or transmitting a visual depiction of that conduct" (3-62 Modern Federal Jury Instructions -- Criminal ¶162.01 (Matthew Bender)). Clearly, using Bobby Fain - who was 11 years old at the time the film was released and likely younger during its filming - was employed by Columbia Pictures, Barwood Films and Longfellow Pictures to produce this simulation of a sadistic rape of his fictitious character. (Interestingly, again, the actor who simulated raping young Bobby Fain could not be charged in any jurisdiction as simulating a rape is not a crime).

The same goes for those who own the movie, sell it, or otherwise access it to view it. Each and every one of them is criminally liable for possessing this video of Bobby Fain suffering a **SIMULATED** sadistic rape.

Again, the guidelines for this single movie would be absolutely ridiculous and produce enormous recommendations. But, for the sake of argument, let us look at what happens when a regular person "receives" both The Prince of Tides and The Kite Runner. The guideline calculation is: 22 (base) + 2 (prepubescent minor) + 2 (simple distribution (assumes pretty much all people will give the movie to their friends to borrow and watch)) + 4 (sadistic material) + 2 (use of a computer) + 3 (150-300 images (2 movies is 75+75)) = 35 (168-210).

It should be noted that it is highly unlikely that Bobby Fain would even be able to aquire restitution for this sexually explicit conduct that was perpetuated against him on camera. Indeed, he would have to show that creating a smash hit movie, that made millions upon millions of dollars - in part because of him - proximately caused him some sort of injury (Paroline v. United States, 134 S.Ct. 1710, 1719 (2014)). But that is ok. Millions of Americans can be put in prison for the "pain" acting out this scene caused him.

The Prince of Tides is a piece of American history and discusses very difficult and touchy subjects. There is nothing that appeals to the prurient interest in sex in this movie (although there is a love story going on between Streisand and

Nolte as well). However, there is no artistic merit exception to the United States' child pornography laws. Thus, The Prince of Tides violates the CPPA and anyone found in possession of it can be prosecuted. As we all know, the only real difference between receipt and possession is just in prosecutorial discretion. There is virtually no difference, yet - in Congress' infinite wisdom - receipt is a crime deserving of a five year minimum imprisonment term (18 USC 2252(b)(1)). It is extremely scary that the government could arrest virtually the entire population for purchasing this movie at some point in the last 25 years because, again, there is no statute of limitations for such prosecutions (18 USC 3283; 18 USC 3299).

### iii. Bad Teacher

-Synopsis

Bad Teacher is a hilarious comedy about a spend-thrift woman who was supposed to marry a very rich man, but was called off due to her spending habits. Thus, she is forced to return to a Middle School to teach children. However, she is not the stereotypical teacher. Indeed, a student catches her smoking marijuana and she employs a scheme to cheat on a state test to be rewarded with a bonus.

In one specific scene, the teacher decides that she can make money by volunteering at the school's car wash fundraiser. While she is there, she washes cars while dancing around like a stripper and is wearing very revealing clothing. The male parents that attend are elated by the dance and donate much more money than expected. The teacher hands over enough money to make the car wash a success in the eyes of the school's administration, and pockets the rest.

During the scene, the camera pans over and shows an 8th grade boy staring at the teacher dancing for the car wash. It also shows that he has an erection protruding from his pants.

It is obvious that the boy has an erection. However, it is unknown if it was a "simulated" erection or an actual erection. For the purposes of this Memorandum, we

will proceed stipulating that it was simulated.

-Statistics

<u>Bad Teacher</u> starred Cameron Diaz and was directed by Jake Kasdan. The film grossed over $100M in the United States and was nominated for numerous awards.

-<u>Bad Teacher</u> violates the CPPA

This film violates the CPPA for simulated lascivious exhibition of the pubic region of a boy under the age of eighteen years.

Were we to proceed with a prosecution for this crime against a child, we do not need to prove the actual identity of the minor (18 USC 2256(9)(B)) and can thus proceed without knowing who the boy is in the movie that lasciviously displayed his clothed, but erect, penis during the "Car Wash Scene". It is clear by watching the movie that the actor is clearly a minor. However, it does not appear that he is a prepubescent minor.

In virtually every prosecution for child pornography, the government brings cases of visual depictions of minors that have not been actually identified, but are "identifiable" as actual children. Therefore, this movie is infected with child pornography, and the entire movie must fall under the CPPA.

Again, were we to prosecute anyone for this movie, their recommended sentence would be out of our solar system.

For the numerous producers of this movie - including the award winning Cameron Diaz - the operative guideline is 2G2.1. The recommended guideline for these child pornographers is: 32 (base) + 2 (12-16 year old) + 2 (distribution) + 2 (supervisory control) + 2 (use of a computer) = 40 (292-365). If these criminals accept responsibility their guideline would reduce to 37 (210-262). It is doubtful that the acceptance award will be of any consolation to any of the "producers" of this child pornography as 17.5-22 years is a really long time to goto prison for making a smash hit movie.

For the commercial distributors of this movie, their offense level is: 22 (base) + 24 (more than $100M in sales (2B1.1(b)(1)(M)) + 2 (use of a computer) = 50 (LIFE). With acceptance of responsibility, the guideline is still LIFE. However, it is unlikely a Court would ever allow 24 levels for the distribution enhancement. Even were we to reduce that enhancement to the minimum five levels, the guideline is still 31 (108-135). With acceptance of responsibility, the offense level would be 28 (78-97). Six to eight years in prison is still a long time for selling such a popular movie. However, its popularity has nothing to do with whether the film depicts sexually explicit conduct involving a minor as defined in the CPPA.

The mere fact that there is no exception for artistic works and it does not matter if the movie was or is popular. The film is infected with child pornography and is thus illegal under the laws of the United States of America.

Surely, the Supreme Court's total prohibition was never intended to produce such extreme results (cf. Ferber 458 US at 756-57 ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling...A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens.")). The idea behind combating child pornography had to do with the actual harm to children, not simulated conduct that is entertaining to the masses (cf. Ferber, Osborne, and Free Speech Coalition supra).

### iv. Sleepers

#### -Synopsis

Sleepers is an adaptation of the memoir by Lorenzo Carcaterra. Mr. Carcaterra tells his story of a prank gone horribly wrong.

In "Hells Kitchen" New York, Mr. Carcaterra grew up like numerous New Yorkers - an abusive household filled with domestic violence, inseparable friends, and dog days of summer. One day, he and his best friends decide to acquire some hot dogs. These

boys do not have the money for the hot dogs and devise a plan for one boy (Mr. Carcaterra) to order a hot dog, and then run when he received the hot dog without paying. The other boys were to goto the vendor's cart and then steal hot dogs for each of them while Mr. Carcaterra was being chased by the vendor.

When the other boys get to the cart, they decide to take the cart as the vendor is still gaining on Mr. Carcaterra. In haste, they devise a plan to take the extremely heavy cart to the subway entrance and drop the front down the first step. This way, when the vendor caught up, he would be forced to grab the cart allowing the boys to run.

The cart was way too heavy for the boys to hold, and it crashes down the steps and strikes a man coming out of the subway.

The boys, naturally, thought they killed the man at the bottom of the stairs.

Mr. Carcaterra and his friends were charged and adjudicated delinquent by the New York State Courts and sent to the reform school. This is where Mr. Carcaterra and his friends would suffer horrific physical and sexual abuse at the hands of the guards.

While he was attending the school, boys were killed, raped, and even forced to eat off the floor.

Many years later, two of the boys run into their chief abuser at a restaurant. However, they are not boys any more and they are gang members. Both decide to shoot their chief abuser in a crowded restaurant. They were clearly not worried about a prosecution - their anger and hatred for the abuse they suffered came pouring out through the barrels of their guns.

Mr. Carcaterra and his other friend went the other direction. Mr. Carcaterra became a reporter and his other friend, "John" became an Assistant District Attorney for the City of New York. The story unfolds as the two friends conspire to (1) ensure their friends are acquitted for the murder and (2) ensure that all the other abusers fall too.

Throughout the movie, there are numerous scenes of simulated sadistic abuse,

but one stands out more than all the others.

In one scene, Mr. Carcaterra (played by Joe Perrino) is in his room. Several guards enter the room, and inform Mr. Carcaterra that it it time for him to say his Rosary. They bend him over the table, and tell him to say "Hail Mary" prayers while they pull his pants down and insert a knight stick into Mr. Carcaterra's anus. The scene is very graphic.

There are many other scenes of conduct that would be considered reprehensible by any modern standard.

Mr. Carcaterra and his friends committed a crime and almost killed someone because of their actions when they were boys. Did they deserve the sadistic abuse they were forced to endure and hold secret for many years? Of course not.

The bigger question is if Mr. Carcaterra was even allowed to tell this story through the visual medium and show the world the corruption of the juvenile justice system in New York?

The CPPA says he is not allowed to.

### -Statistics

Lorenzo Carcaterra is played by two actors. For the part of his story in question here, he was played by Joe Perrino who was born in 1982. The movie itself released on October 18, 1996. Thus, Mr. Perrino was between 13 and 14 years old at the time of its release. The movie also had high ranking actors, Kevin Bacon, Brad Pitt and Robert Deniro. The movie was directed by Barry Levinson.

Sleepers generated over $53M in gross revenue in the United States and was nominated for an Oscar award.

### -Sleepers violates the CPPA

This movie certainly violates the CPPA. Joe Perrino was certainly a minor during the filming of this movie. It is very hard to tell in the movie, but we assume that the producers did not actually force a knight stick into Mr. Perrino's anus.

Sadly, Kevin Bacon was directly part of this simulation of sadistic sexual abuse of Mr. Perrino.

Again, in order to prove this visual depiction violates CPPA, all we must do is prove that Mr. Perrino was under the age of eighteen, and that the movie producers employed him to make this scene to include in this movie (see 3-62 Modern Federal Jury Instructions -- Criminal, ¶62.01 (Matthew Bender)).

All the producers of this film are facing 15-30 years, for this single scene. Certainly, all the other simulations of abuse in this movie (like when all the boys were beaten because they would not give oral sex to the guards) could be used to prosecute more counts, and all the producers could conceivably receive a de facto life sentence.

Again, there is no artistic merit exception to the CPPA. There is no requirement that the government prove a minor was actually abused during the creation of the video.

### v. The Hunger Games

The Hunger Games was adapted from the book by Suzanne Collins. The story is about post-apocalyptic America following a civil uprising. The civil uprising failed and the government generated a lot more power and retaliated against the people.

In order to maintain order among the people and to prevent another civil uprising, the government passed a law mandating that two children (1 boy and 1 girl) from each of 12 districts, between the ages of 12- and 17-years, were to be randomly selected to participate in a game to the death. There could only be one winner, and that winner would be given the "luxury" of never having to work again - at least in the typical way.

The lottery to select the children was "random" but tied to extra food rations. The "Capitol" ensured that each child - beginning at age 12 - would have one ballot placed in the selection box for each year. The Capitol also were so restrictive on their general food and supply rations, that the children could buy a small amount of

extra rations for the price of another ballot in the box. Children were forced, by the government, to choose life with food and possible death in the gaming arena, or certain death from starvation for their families or themselves.

The selection process in and of itself was sadistic. Each district's selection "ceremony" is aired nationally, and the people of the Capitol - who are never selected themselves - cheer for the beginning of the games. The people of the Capitol start to place bets on those selected to "participate" in the game to the death. Who will win or who will lose? "May the odds be ever in your favor!" The selection process was obviously very scary for the children.

Katniss Everdeen was not selected for the games, but her 12-year-old sister was. Despite Katniss preventing her sister from receiving extra rations, her ballot was still drawn. Consequently, Katniss decides to "volunteer" and take her sister's place in the Hunger Games.

The games themselves were described by Katniss - throughout the book trilogy - as "sadistic". Surely, any government as tyrannical as the one described in the Hunger Games is sadistic.

There are numerous scenes of children simulating death and destruction throughout The Hunger Games movies. In the first movie, 22 children simulate death in the arena while the people of the Capitol place bets and "Game-makers" throw curve balls every step of the way. The children must learn to kill or be killed in a very short amount of time and then survive a melee.

-Statistics

The Hunger Games broke the box office. The movie made - as of August 31, 2012 - nearly $408M in the United States alone. It was nominated for numerous awards and its cast hailed as spectacular.

The books were also extremely popular; especially among the younger generation.

The first movie was released in 2012 and employed numerous real children to act as the selectees for the games.

### -The Hunger Games violates the CPPA

How in the world could this movie violate the Child Pornography Prevention Act? The Court may actually believe that Mr. Khan has lost his mind at this point. However, Mr. Khan posits that The Hunger Games indeed violates the CPPA as the CPPA does not require that "sexually explicit conduct" actually be sexually explicit. Indeed, the CPPA prohibits the creation and/or dissemination of any visual depiction that "simulates...sadistic or masochistic abuse" of real, identifiable (but not identified), children (18 USC 2256(2)(A)(iv) and (2)(B)(ii)(III). As we discussed before, sadism and/or masochism are not limited to sexual conduct. Either word is employable when a viewer delights in someone else's pain (sadism) or the recipient of the painful act enjoys the pain (masochism) (see section 3.b.1 (pp. 57) supra). Surely, to take a bunch of children and place them in an arena - by the operation of law - to kill each other for the enjoyment and benefit of the government and public at large is "sadistic". Nobody in their right mind could contend otherwise. The CPPA prohibits any sort of simulation of sadistic abuse - and The Hunger Games did it several times over. Each and every producer of this movie can be charged with a count of production of child pornography for each and every child employed to simulate these "games". So, taking the 24 youth that were placed in the arena, each producer is facing 15-720 YEARS by operation of statute (18 USC 2251). Indeed, all these producers engaged in a conspiracy to "buy" these children by paying their parents and the children themselves for their acting in the movie. Thus, they could be charged with 24 counts (minimum) of Selling or Buying of children for the purposes of producing "sexually explicit conduct" as defined in the Act (18 USC 2251A). Under this, the offenders are facing 30-LIFE. The parents of each and every one of these children is facing 30-LIFE for selling their children for this movie. All of the distributors, receivers and possessors, should they be federally

prosecuted, are facing absurd sentences for this movie.  How many of the offenders here are children?  The movie does not have any restricted ratings and children can (and do) buy this movie for themselves.

### 4.  Conclusion to Section D

The CPPA has produced an absurd result.  The First Amendment demands that Congress be very careful in how they proceed in enacting laws that restrict free expression so as to avoid the result here.  The Supreme Court has been exceedingly clear that the prohibition on child pornography needed to be a narrow prohibition to ensure that legitimate First Amendment protections remain inviolate.  As it stands right now, the United States can prosecute - effectively - the entire Country for violating the child pornography laws.  How many Senators, Congressmen, Judges, Justices, their friends, family and loved ones are susceptible to the government's reach under this law?  Does the Court want to find out?

In _Brune_ the Tenth Circuit recognized "[a]n imprecise law that criminalizes access to Nabokov's _Lolita_ or Woody Allen's _Manhattan_ will not survive constitutional scrutiny even if it also bans actual hardcore images of underage victims" (_Brune_ 767 F.3d at 1018).

Congress has plainly gone too far.  They have had numerous opportunities to create a law that protects children from actual sexual abuse.  They have not.  Instead, they have prohibited all speech on the subject of childhood abuse by prohibiting the number one medium for communicating any opinion about it.  None of these movies were advocating for the abuse of children.  Indeed, each movie was showing the effect of horrific abuses on children and society as a whole.

There are numerous other examples of the reach of the CPPA.  Curiously, our Tenth Circuit affirmed a district court's judgement that the movie _The Tin Drum_ was not considered child pornography; at least under Oklahoma law (Camfield v. City of Oklahoma City, 248 F.3d 1214 (10th Cir. 2001)(aff'd in part, dismissed as moot in part)).  _The_

<u>Tin Drum</u> uses an 11 year old actor to portray "activities clearly suggestive of a sexual act" (Oklahoma ex rel. Macy v. Blockbuster Videos, Inc, 1998 US Dist. LEXIS 22096 (W.D.Ok. October 20, 1998)).

In today's technological world it is becoming easier and more commonplace for major film producers to create scenes that violate the CPPA with ease. Be that as it may, the First Amendment would protect anyone who made anything similar. However, the CPPA says otherwise.

It is clear, the CPPA violates the First Amendment and must fall. Consequently, Mr. Khan's convictions must be vacated in toto, and Congress directed to go back to the drawing board.

It must be stated; Mr. Khan is not saying that the government should just allow child pornography to continue to proliferate through the streets of America or the world for that matter. When children are actually harmed, it is wrong. They do not have the capacity, at least under American law, to enter into a cell-phone contract. Certainly, they could not enter into any contract for sexual activity - no matter how knowing and voluntary this is. However, there are times in our society where children are used to simulate taboo topics to make a point. Is it any wonder why <u>A Child Called It</u> by David Pelzer was not turned into a movie? It is pretty obvious, the only way to do this would be to show a boy between the ages of 5 and 11 being horrifically and sadistically abused to make the point of the memoir.

A great example of just how the CPPA can stop a great book from being a great movie is with the book <u>Running with Scissors</u> by Augustren Burroughs. The movie that came out used an actor who was nearly 20 years old instead of using someone closer in age to Mr. Burroughs at the time. In the book, Mr. Burroughs was about 13 or 14. He was targeted by a pedophile and engaged in numerous sexual activities with that pedophile. The scenes were described in the book in detail. While Mr. Burroughs uses humor to make his point, the movie lost all the edge of the book. It lost its

authenticity - and was not nearly as popular as the book.

Another stunning example of the restraint caused by the CPPA is with The Game of Thrones. The books, written by George R.R. Martin are spectacular works of fiction that utilize medieval examples of ways of life. Joffrey - the first King - was extremely abusive towards his betrothed, and he was only 12. His betrothed was only 12. "The King of the North", Rob Stark was killed at when he was 16 and his wife's baby was cut out of her stomach. Bran Stark was pushed out of a window at 10 years old. Sexual acts between boys and men are described throughout the book; making pederasty part of the societal norm in "Westeros". However, when you watch the television show by ShowTime, all of the actors are easily 10 years older than portrayed in the book.

Mr. Khan cannot speak for the producers of the show, but the question lingers: Did the CPPA cause Showtime to be restrained? The irony here, is that Mr. Khan read each and every one these books while he was in custody. Indeed, he also watched all of these movies while in custody for child pornography offenses.

The CPPA is substantially overbroad, and for the same reasons it is also vague. There are way too many applications beyond the original intent of the protection of children for the CPPA to survive constitutional muster.

IV.      Conclusion

There is no doubt, this is a lot to digest. Be that as it may, the errors in this case were inexcusable. Defense counsel and the prosecution should be reprimanded for their malfeasance. Mr. Khan was entitled to a fair proceeding. In his case, however, the cards were stacked against him. Was it because of his sexuality, heritage, community status? It certainly looks that way - at least with regard to the prosecution's overt misconduct. The beauty of America is that we are supposed to be fair to everyone - regardless of what anyone (including the government) has to say about them. Mr. Khan had a very misguided youth. While that is certainly no excuse for his conduct as an adult, it surely explains what happened. Mr. Khan is fortunate in so many

ways. He has a family - for better or worse - that loves him and supports him. Yes, that same family had many tough times throughout life. Some of those times involved the abuse of Mr. Khan. However, in recent years they have moved passed the negative and are trying to find the light to a forward path. Mr. Khan has already used the last five years to learn the law and is now before the Court with all of his issues. These are not mere gripes. He is complaining that he was deprived the most precious of his protected rights under our Constitution. No man should be held to answer for any crime if the conviction obtained is going to be at the expense of the rights granted by the Creator and protected by the Constitution. Our democracy rests in large part on the fairness of our justice system. Yet, there was no fairness in Mr. Khan's case.

WHEREFORE, Mr. Khan asks this Court to grant his Petition for a Writ of Habeas Corpus pursuant to 28 USC 2255 and grant relief as the Court deems appropriate to tease out the errors of this case.

Dated: July 26, 2017
      Fort Dix, NJ

Respectfully Submitted,

Erik Bilal Khan #66770-051
FCI Fort Dix
PO Box 2000
Joint Base MDL, NJ 08640

PRO SE

PRIORITY®
★ MAIL ★

▦ DATE OF DELIVERY SPECIFIED*

⌇ USPS TRACKING™ INCLUDED*

$ INSURANCE INCLUDED*

🚚 PICKUP AVAILABLE

* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

FROM:
Erik Khan #66770-051
FCI Fort Dix
Po Box 2000
Joint Base MDL, NJ 08640

TO:
U.S. District Court
Attn: Clerk of the Court
100 N. Church St.
Las Cruces, NM 88001

SCREENED BY CSO
AUG 07 2017

RECEIVED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

AUG 0 7 2017

MATTHEW J. DYKMAN
CLERK

Expected Delivery Day: 08/07/2017

USPS TRACKING NUMBER

9505 5157 9451 7216 0733 69

EP14F July 2013
OD: 12.5 x 9.5

P S00001000014

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES
POSTAL SERVICE®


PAID
JOINT BASE MDL, NJ
AUG 04 17
00640
AMOUNT
$0.00
R2305M146244-07
88001